Commonwealth *v.* Greenberg, Appellant.

Argued November 18, 1940.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER, RHODES and HIRT, JJ.

*David Getz,* with him *Wilber H. Van Dine* and *Theodore R. Gardner,* for appellant.

*Edward G. Biester,* District Attorney, with him *Willard S. Curtin,* Assistant District Attorney, for appellee.

OPINION BY CUNNINGHAM, J., January 30, 1941:

The appellant, Adam Greenberg, fifty-six years of age and a native of Latvia, has appealed from a sentence of a fine of $300 and imprisonment for not less than six months nor more than two years, pronounced against him by the court below upon a verdict finding him guilty of having burned, on the early morning of October 6, 1938, the Black Cat Inn, owned by him and located on the Easton Highway in Plumstead Township, Bucks County. The indictment was drawn under the Act of April 25, 1929, P. L. 767, as amended by the Act of June 12, 1931, P. L. 541, 18 PS §§ 3021-2, and contained four counts: (1) Arson of a dwelling house; (2) aiding and abetting in the arson of a dwelling house; (3) burning a building, and (4) aiding and abetting in the burning of a building. It was returned a true bill on November 29, 1938; the first trial thereon was had in September, 1939, and resulted in a general verdict of "guilty." For reasons not now important a new trial was granted, and the one out of which this appeal arises came on in February, 1940.

The result of the trial with which we are now concerned was a verdict of guilty upon the third and fourth counts. The court below ordered that the present ap-

peal from the sentence thereon should operate as a super-sedeas.

The circumstances surrounding the fire were essentially as follows: From the time appellant acquired title to the property on February 5, 1937, by virtue of foreclosure proceedings instituted by him, he operated it as an Inn and dance hall serving food, beer and soft drinks. His family, some of whom assisted in conducting the Inn, resided on his farm about nine miles from the Inn. Appellant, however, spent "mostly every night at the Inn." The building itself consisted of a main, two-story section on the northern side, some parts of which were constructed of concrete blocks and others of frame and plaster composition, and a one-story addition on the south containing a kitchen built of frame and lined on the outside with composition shingles. The main entrance was through a door at the eastern side of the building, opening into a one-story bar and cloakroom which, in turn, opened into the dance hall, occupying the entire first floor of the main building.

On the night of the fire, appellant had retired in the southeast bedroom on the second floor about half past one. Sometime prior to four thirty o'clock the fire started. Appellant testified he left the building by a door on the south side which opened into a hallway leading to the kitchen, the stairway to the second floor and the dance hall, which door he believed had been left unlocked. He was first seen, apparently in night clothes, by two truck drivers, who said he was then emerging from the flames near the front or east end of the building, but they were unable to say which door he may have passed through. These men had stopped sometime around four o'clock, having been attracted by the fire. One of them went to a diner to call a fire department, after appellant acquiesced in this suggestion, but the Plumsteadville Fire Company had already been called by a neighbor who saw the fire from his property, immediately reported it, and

arrived at the scene within seven or eight minutes. Shortly afterward the firemen arrived and checked the fire which by that time had practically consumed the kitchen. The firemen and a state police officer having searched the premises found various evidences of what the Commonwealth contended were preparations for igniting and spreading a fire, which will hereinafter be discussed in detail.

The testimony did not disclose an excessive amount of insurance. Appellant had maintained insurance on the property in the total amount of $4000 from the time he acquired it and the contents were insured for $1500, whereas the lowest valuation placed upon the property, exclusive of contents, by a real estate expert was $5500, and appellant, as testified by his son, Rudolph, had spent an amount in excess of $2500 on improvements and furnishings. The Commonwealth asserts, however, that the testimony discloses a motive for appellant's setting fire to his Inn. In 1935 he made loans to Messrs. Wadin and Schenk, the then owners—one for $4300, secured by a mortgage on the Inn, and the other for $250, secured by a judgment note. Very little had been paid by the mortgagors upon account of interest or taxes before appellant was obliged to foreclose and acquired title at sheriff's sale. His intention, it is suggested, was to take over the property to protect his investment, and the improvements were made with the idea that his son, Rudolph, would operate the Inn. The latter worked there for a few months but left for a better job, and it is argued that appellant didn't want to run the Inn himself. Although Rudolph testified there was a record crowd the Saturday night of the week preceding the fire, the business was apparently poor on week-nights. According to appellant himself: "Q. If you sold a half barrel of beer during the week, that was pretty good business? A. Yes, that is pretty good." Appellant had asked a real estate broker to try to sell the property at an asking price of $8500 and the broker testified the value of the land and build-

ings the day before the fire was $7500. There was no evidence of any inquiries by prospective purchasers and it is implied that appellant conceived the idea that by collecting upon his fire insurance something might be salvaged from the total of about $9000 he claimed to have put into the property, and possibly as much might be obtained from a sale.

The evidence upon which the Commonwealth relied as requiring the submission of the case to the jury and fully justifying the verdict was purely circumstantial. It related chiefly to the discovery by firemen of five actual, but smaller, fires in widely separated portions of the building each remote from and unconnected with the kitchen, and to the finding in five other separate parts of the building of combustibles indicative of preparations for fires.

The theory of the defense was that the alleged preparations were in fact articles placed where found either by chance or for normal household purposes, and that the fire started in some accidental manner from the wood fire appellant left burning in the kitchen stove when he retired and spread therefrom to the other portions of the building, where evidences of fire were discovered, by radiation without any direct application of flame, thus attempting to explain the absence of any burning at intervening points.

An explanation of the manner in which fire may spread within a building by radiation was given by Deputy Chief, William Simmler, of the Philadelphia Bureau of Fire, called as a witness for appellant. He testified that heat waves radiate from an existing fire until they strike a solid object whereupon they back up and cause an accumulation, and a greater degree of heat, at the extreme points reached by the waves than in the intervening space. If there is sufficient heat to raise the temperature of an object, encountered by the waves, to its ignition point it will ignite without any direct application of flame.

The twenty-four assignments of error naturally divide themselves into two general groups: (1) Those relating to the refusal of the trial judge to sustain appellant's demurrer to the evidence introduced by the Commonwealth, and his refusal to direct a verdict in favor of appellant upon the whole record; and (2) Those based upon alleged trial errors.

1. We can best pass upon the merits of the first group by reviewing, and necessarily at some length, the testimony as to points where fires had actually started, with the attendant evidence of preparations for setting same, and then the evidence relating to the points at which combustibles were found but no fires had occurred. In each instance we shall state the explanation, if any, given by the appellant or on his behalf so that a fair appraisal of the force of the evidence may be made.

Commencing at the lowest point at which evidence of fire was present, it is to be noted there was a small cellar, eleven by fifteen feet, underneath the north side of the dance hall with an entrance from the north side of the building. There were two or three bushels of corncobs along the south end of this cellar and those on top of the pile had been burned. The furnace was also located in this cellar along the north wall and in it were found burning corncobs and two jars. One was empty and the other "contained a very little liquid that smelled like gasoline or kerosene." There were also several jars and cans containing a liquid having an oily odor like gasoline or kerosene placed on a hanging shelf along the west wall, and along the south wall upon the concrete foundations between the joists which ran east and west. These joists or beams were badly charred. Officer Gowan testified that appellant said in regard to the cans that he was doing quite a bit of painting and they looked like cans that contained paint, but he didn't know how a liquid smelling like gasoline or kerosene got in there. However, appellant himself said he kept kerosene in paint cans to light the furnace fire, soaking the corncobs with it, and

that he thus lighted the furnace the night before the fire. He also said there were jars left there by former owners and that possibly they had put the fluid in the jars in cleaning up the cellar after seepage from a damaged gasoline line running near it. Although this testimony was partially substantiated by George Seips, a former owner, who said he kept some coal oil in jars to start the furnace fire, the latter also said he kept none of the oily liquid mixed with water obtained from bailing out the cellar: "Q. You didn't keep it [water mixed with oil]? A. Oh, no, what good would it be to me? ...... I wouldn't know what to do with it." Appellant gave no explanation for the burning of the corncobs which had not been placed in the fire or of the presence of jars in the furnace one of which contained oil.

The basement, incidentally, was under a portion of the dance hall floor some twenty to twenty-five feet northwest of the kitchen and the only opening into it was an outside door in the north wall of the building. It is not difficult to understand why a jury would decline to believe that fire had been communicated to the inside of this basement from the kitchen, located upon the ground level of the south side of the building, by any theory of radiation.

There had also been fire in the first floor cloakroom situated at the east end of the dance hall. One of the firemen testified he there saw an "ice cream carton filled with coat hangers lying on the floor which had the bottom of it burned out and there were paper ashes lying just around the center of the floor." The carton was along the northeast wall of the room, and in the center of some burned paper and ashes there was a cracked and broken mason fruit jar containing fluid smelling like gasoline or kerosene. The only explanation tendered by appellant in this connection was that when hangers were "no good" or "dirty" they were thrown in the box and that extra hangers were kept there, but no reason for keeping dis-

carded hangers and extra ones in the same carton was given.

As already indicated the kitchen on the south side of the first floor was practically consumed by fire so that subsequent examination disclosed little but debris. Appellant admitted that there had been a wood fire burning in the coal stove when he retired for the night and that he kept kerosene under a sink beside the stove; his wife testified that corncobs were also used to light this stove but there was no evidence or suggestion as to the manner in which sparks might have been emitted from the stove so as to cause an accidental fire even in the kitchen.

Proceeding to the second floor, we find that there was considerable fire in the southeast bedroom occupied by appellant. Small holes were burned through the floor "near the south wall about six feet from the east wall" and there was a badly burned mattress on an iron bed. The mattress was made of straw; its cover had been burned off and it had a strong odor of gasoline or kerosene. In the southeast corner at the foot of the bed there was a large cardboard box or carton containing a telephone directory, some decorations, victrola records and rags that had been saturated with an oily substance. "The box was saturated to the extent you couldn't pick it up...... It was wet or soggy" with something of an oily nature. Appellant told officer Gowan that the box had been in his bedroom for some time but he had no idea how oil got in it. He gave no explanation as to how kerosene could have been placed in the box or upon its contents and his denials were evasive: "Q. Did you ever have kerosene in it? A. No. What I going to do that? Q. Did you ever put kerosene in it? A. What I going to do that for?" Although Mrs. Greenberg testified she used gasoline to clean the springs and mattresses of the beds to keep them free from bedbugs, she testified concerning this box: "Q. If there was any oil or kerosene or any other oil substance in that box, do you know how it got there? A. I don't know. Q. Did you put it there? A. No."

It was also apparent that there had been fire in the nearby bathroom. In the center of the floor near the bathtub was a broken milk bottle or fruit jar surrounded by paper and rags which were partly burned as were some rags hanging on the side of the bathtub. There was also a partly burned paper ice cream container in which were paper and rags. The congoleum on the floor was charred near the bottle and the container which was wet had a very strong odor of oil or gasoline. The broken bottle contained a small amount of liquid with a similar odor. Appellant stated there had originally been ice cream in the container and that it was used as a waste paper basket for rags and papers, but he had no idea how the container and its contents got oil on them. He couldn't remember whether or not he had seen the broken bottle as a lot of them were kept around for paint and his wife used jars of that kind to put gasoline on the springs and mattresses of the beds. The latter testified the "rags" were really towels and corroborated her husband's statement that the container was used for waste paper, but no satisfactory explanation was given for the presence, in the middle of the room, of the bottle and its contents surrounded by rags and papers, nor for the fact that the container and its contents were saturated with oil.

Finally, there was fire in a bedroom at the extreme southwest corner of the building. This room was at the opposite end of the hall from the one occupied by appellant and five rooms intervened. The curtains were burned as was the woodwork around the windows. The bed and its mattress and covering were pretty well burned. The footboard and headboard of the bed, and the paint on the doors and dresser, were scorched. There was an odor of gasoline or kerosene on the mattress.

We pass now to a consideration of the various indications of arrangements for spreading a fire throughout the building. In the southeast corner of the dance hall there were two buckets or containers and five one quart

mason fruit jars, surrounded by debris, all of which contained an oily substance. Appellant didn't recall having seen the containers around and didn't know how they got there, nor did he remember seeing the jars on the dance floor although he said they had jars of this nature for ashes and cigarette stubs in which kerosene was placed to burn them; his son Rudolph stated similar jars had been used for flowers. They did not explain, however, why there was oil in the buckets and jars while they were permitted to remain on the dance floor. Mrs. Greenberg admitted she could offer no explanation.

There were three closets, opening at intervals off the second floor hallway. A one quart milk bottle three-fourths full of oil was found on the floor of the closet at the western end and it was surrounded by rags and paper smelling of oil. Appellant said there were a lot of milk bottles around but he didn't know how that one got there, except that his wife used such bottles for gasoline to clean springs and mattresses. On the floor in the middle closet was a box containing old papers and rags saturated with oil. Officer Gowan said there were wet papers and rags smelling like gasoline or kerosene found on the floor of the eastern closet.

In the unfinished attic on the north side of the building were found a number of paint cans and jars one of which was about half full of a liquid that smelled like kerosene or gasoline, and some paint brushes were in this jar. Appellant said the brushes were kept soft that way as he was doing painting "pretty near all the time." His testimony relative to the paint brushes was corroborated by that of his son, Rudolph. The presence of these articles, except when considered in conjunction with the various other evidences of preparation, would have no particular significance.

There was also a closet adjoining the southeast bedroom occupied by appellant in which was found a cardboard box containing some oil-soaked rags and paper.

Appellant said he didn't know where it came from or how it got there, unless his wife, who sometimes used kerosene or coal oil to clean the windows, might have dropped some in the box. The evidence, however, was that the box and its contents were saturated with oil.

As appellant by his own admission in open court was alone upon the premises for several hours preceding the outbreak of the fire, the case necessarily hinges upon the question whether it originated in some accidental manner from the kitchen stove or was deliberately planned and started by him.

The test of the correctness of the rulings of the trial judge, BOYER, J., upon the questions raised by the assignments now under consideration, is whether the evidence, if believed by the jury, met the requirement of the rule that in cases such as the one at bar "the evidence of facts and circumstances must be such as to *exclude to a moral certainty* every hypothesis but that of guilt of the offense imputed, or in other words the facts and circumstances must not only all be consistent with and point to the guilt of the accused, but they must be inconsistent with his innocence" (*Com. v. Byers,* 45 Pa. Superior Ct. 37) ; or at least met the modification of the rule, suggested by President Judge KELLER in *Com. v. Marino,* 142 Pa. Superior Ct. 327, 16 A., 2d 314, to the effect that "the circumstances proved should be such as reasonably and naturally to justify an inference of the guilt of the accused, and should be of such volume and quality as to overcome the presumption of innocence and satisfy the jury of the accused's guilt *beyond a reasonable doubt.*" (Italics supplied.)

In our opinion, the foregoing recital of facts, concerning which there was practically no conflict in the testimony, demonstrates that the circumstantial evidence in this case supports an inference of appellant's guilt not merely beyond any reasonable doubt but even beyond any doubt.

Unlike the case of *Com. v. Pogach,* 119 Pa. Superior

Ct. 510, 180 A. 126, in which the presence of certain combustibles in the cellar of a storeroom, giving rise to a suspicion of incendiarism by the owner, was logically and convincingly accounted for, we find upon this record clear evidence of the placing and actual ignition of, combustibles in at least five different places in the building, exclusive of the kitchen and including the cellar, the cloakroom on the first floor, and two bedrooms and a bathroom on the second floor, and of arrangements for spreading a fire in the dance hall, three closets opening into the hallway of the second floor, and in one place in the attic. No satisfactory explanations of the placing of combustibles at these various points throughout the building, from the cellar to the attic, was given by appellant or the witnesses called in his behalf. The only explanation attempted was that his wife had used gasoline in the bedroom for the purpose of cleaning bedsteads and protecting mattresses from bugs, but she admitted that the last time she had used gasoline for this purpose was "maybe a month, maybe more than a month ...... maybe two months" before the fire.

Our conclusion upon this branch of the case is that the trial judge was fully justified in submitting the case to the jury.

2. Upon the second branch of the case we have examined all the assignments predicated upon alleged errors in the admission or exclusion of testimony and in the charge and will refer as briefly as possible to those meriting discussion.

(a) We are convinced no error was committed in admitting as exhibits for the Commonwealth various jars and other containers and receptacles containing oily liquids or saturated therewith. Proper custody of the same was shown with unbroken continuity insofar as this was possible where a period of many months intervened between the time of the fire and the second trial and satisfactory reasons were given for allowing access to them upon every occasion when this was done. The jury

was properly advised of all known changes in the condition of the exhibits since the time they were found at the scene of the fire and furthermore there is no evidence affirmatively attacking the genuineness of the exhibits or tending to show they had been tampered with.

(b) The complaint that the trial judge unduly limited the examination by counsel for appellant of prospective jurors upon their voir dire is without merit. The extent to which such examinations may properly go is a matter largely within the discretion of the presiding judge and we find no abuse of that discretion in this case.

(c) The seventeenth and eighteenth assignments allege error by the trial judge in sustaining the objection of the Commonwealth to certain questions propounded to the witness Simmler, who, as above stated, had given the jury a full explanation of the theory of the spreading of fire by radiation. His examination of the premises had been made more than a year after the fire. Counsel for appellant proposed to elicit from him as an expert his opinion relative to the "origin of this fire." In sustaining the objection of the Commonwealth the trial judge said: "The objection is sustained first on the ground that the witness's examination of the premises was too remote from the time of the fire and, secondly, that the explanation of the cause of burning in particular locations or spots in a building is not a matter for expert testimony, but for the jury exclusively."

We are not convinced that any error was committed in this ruling. All the scientific principles contended for in behalf of appellant concerning the conduction of fire by radiation and all other technical features of the defense which were not matters of common knowledge had already been explained to the jury by this witness who had been given great latitude in his explanations. The "origin" of the fire was the fundamental issue of the whole case. "Necessity is the ground of admissibility" of expert evidence: *Cooper v. Metropolitan Life Insurance Co.*, 323 Pa. 295, 301, 186 A. 125. Such testimony was

essential in order to enable the jury to understand the theory upon which appellant endeavored to account for the spread of the fire, particularly from the east bedroom on the second floor along the hallway to the west bedroom and past four intervening bedrooms without setting fire to the hallway or any of the intervening rooms, and the jury had the full benefit of the expert evidence offered to support that theory. It was the exclusive function of the jury to determine, from all the evidence and under proper instructions from the court, whether the "origin" of the fire was accidental or incendiary and we think the trial judge properly declined to permit the witness to express his individual opinion upon that vital question.

Counsel for appellant also submitted to the witness a hypothetical question reading: "Now assuming that there is a building, Chief, where a fire may have originated in the first floor, the first floor portion of the building, and assuming that a building has a hallway leading into a second floor, and assuming that the second floor has a hallway which runs north and south and assuming that there are a series of rooms, would it be possible, Chief, for a fire to—would it be possible for evidence of fire to appear in the extreme ends without any actual flames being applied during the intervening space?"

The question was objected to upon the ground, inter alia, that it did not include all the facts appearing from the evidence and particularly those unfavorable to appellant. In sustaining the objection the trial judge said: "It seems apparent this is a hypothetical question based on at least some of the facts in this case, and all of the assumed facts would be applicable, I take it, to this case, but it does not contain all of the facts, only certain facts picked out of this case, and as a hypothetical question, we think it is objectionable on that ground, and sustain the objection." In our opinion the reasons thus assigned justify the ruling complained of.

(d) It is further contended that the testimony of

Felix Gowan, a member of the Pennsylvania Motor Police, relative to information received from appellant, was improperly received in view of Section 4 of the Act of April 27, 1927, P. L. 450, as amended by the Act of June 29, 1937, P. L. 2403, 35 PS § 1184, which provides that the Pennsylvania Motor Police "may at any time investigate the origin and circumstances of any fire" and may summon witnesses, but that "no person shall be prosecuted or subjected to a penalty or forfeiture for or on account of any transaction, matter, or thing concerning which he may have been required so to testify and produce evidence, documentary or otherwise; and no testimony so given or produced shall be received against him upon any criminal investigation or proceedings."

In overruling this assignment we adopt the following language of the lower court: "This objection appears to be clearly without merit. It is not pretended that the defendant made the statements to the officer under any compulsion or as a witness testifying under oath at an investigation. His statements, according to the officer's testimony, were entirely voluntary even though he may have been asked questions by the officer. This was done informally while on the way to, and at the Police Barracks. This question has been clearly ruled in *Com. v. Friedman,* 94 Pa. Superior Ct. 491, and *Com. v. Friedman,* 100 Pa. Superior Ct. 164. While these decisions were based on the original Act of 1927, there is nothing in the amending act to make them inapplicable here. In the former case the Superior Court, in its opinion by Judge GAWTHROP, said in part: 'In our view the only persons exempted from prosecution under the Act of 1927 are those who have been summoned and have been compelled to attend and, over their objection, to testify under oath at an investigation conducted before the state police or its assistants, relating to the origin or circumstances of a fire which has occurred in the Commonwealth ......' In the second case the court in an opinion by Judge BALDRIGE, also said: 'The defendant

was under arrest but he was not summoned or compelled to testify and there was no such investigation conducted as contemplated by the act. The statement he made had the same effect as any other statement of one under arrest.' Clearly the test is not whether the defendant was under arrest at the time; but rather, whether he was compelled to testify as a witness against his objection in a formal investigation."

(e) As respects the assignments of alleged errors in the charge, it may be observed that they consist largely of criticisms of individual paragraphs wrested from their context. We have examined all of them carefully and are of opinion that when the charge, including the supplemental instructions given at the instance of appellant's counsel, is read and considered as a whole, it was free from error. It was a fair, impartial and adequate, presentation of the respective contentions of the Commonwealth and the appellant, and of the evidence by which each side sought to support its theory of the case. Appellant had a fair trial in which his rights were fully protected; his conviction was due to the cumulative and overwhelming weight of the evidence against him. The assignments are severally overruled.

Judgment affirmed and it is ordered that the appellant appear in the court below at such time as he may be there called and that he be by that court committed until he has complied with the sentence or any part of it which had not been performed at the time the appeal was made a supersedeas.