John F. BOGACKI and Mary Ann Bogacki, a partnership doing business as Royal Lanes, Appellants,

v.

AMERICAN MACHINE & FOUNDRY COMPANY, a Corporation.

No. 17427.

United States Court of Appeals Third Circuit.

Argued April 25, 1969.

Decided Sept. 30, 1969.

Rehearing Denied Nov. 4, 1969.

Freedman, Circuit Judge, dissented.

Louis C. Glasso, Pittsburgh, Pa., (Gerald N. Ziskind, E. B. Strassburger, III, Pittsburgh, Pa., on the brief), for appellants.

John F. Potter, MacDonald, Illig, Jones & Britton, Erie, Pa., (John E. Britton, Erie, Pa., on the brief), for appellee.

Before BIGGS, FREEDMAN and STAHL, Circuit Judges.

## OPINION OF THE COURT

BIGGS, Circuit Judge.

On October 18, 1965 a fire destroyed a commercial bowling establishment in Ridgway, Pennsylvania, owned and operated by the plaintiffs-appellants, the Bogackis, husband and wife. The physical plant was completed in July 1958 and consisted of a one-floor concrete block shell, with a permastone facade and a "Rilco" laminated wood 50' x 135' "O-truss" roof. The construction of the unit, excepting the plumbing and electrical work, had been done by John F. Bogacki. The building contained eight automatic "pinspotters", developed and marketed by the defendant-appellee, American Machine & Foundry Company, "AMF". The pinspotters were located in the rear at the west wall of the building and between them and the back wall was a five-foot aisle, in which Bogacki stored tools, lacquer, and other materials employed in the alleys' routine maintenance.

The bowling machines were operated by an electric "brain". The electric power to the pinspotters was controlled by a "manager's control" switch near the front of the bowling building. This switch allowed an attendant to cut off the power to any bowling lane or combination of lanes and was coordinated with certain metering devices. This switch was "energy-limiting", i. e., a switch which limited the power in the circuit to a harmless level in the event of malfunctioning.

There was a "master control" switch, a circuit breaker, at the rear of the building. The master control switch when thrown out of circuit would cut all electricity from the bowling machines. Both switches had to be closed in order for the pinspotting machines to operate.

The operation of the bowling lanes was as follows: When the ball struck the pins it rolled toward the back of the alley and hit a cushion, activating a "stepper" relay. This device, located in the "brain", caused a "sweeper" and a "table" to lower themselves into the lane. The sweeper pushed the fallen pins off the lane, and the table picked up those pins which remained standing. The fallen pins were then pushed back against a cushion by a sweeper which arranged them in an elevator mechanism. The elevator mechanism carried the pins back up to the table setting them in place for the next bowler.

The pinspotters were installed by AMF seven years before the fire on a lease basis. Paragraph 3 of the lease stated as follows: "It is mutually agreed that any defects appearing more than one year after installation date shall be deemed to be due to ordinary wear and tear, but AMF will repair or replace, free of charge, f. o. b. factory, any parts of the machines which are defective in workmanship or materials and are returned within one year from the installation date. Operator acknowledges that all emergency service or repair calls shall be at Operator's expense at then prevailing rates, notwithstanding the preceding sentence. Operator shall not make any addition, subtraction or alteration affecting the machines without the consent in writing of AMF, which consent shall not be unreasonably withheld, shall promptly notify AMF of any noticeable defects in the machines and shall maintain the machines and keep them clean and free from dust in accordance with the manual of instructions furnished by AMF. In no event shall AMF or the manufacturer of the machines be liable for any loss to Operator caused by the operational fail-

ure of the machines." By the terms of the lease AMF was required to service the machines by its service men and to repair parts. The Bogackis agreed to make use only of AMF parts and service and to keep the machines in good condition and to replace worn and damaged parts.[1]

Bogacki maintained the machines and to some extent carried out the routine repairs suggested by AMF service men. It appears from the record that the machines were not kept in good repair.

On Friday, October 15, 1965, Neals, a part-time employee of the Bogackis, was told by a group of women bowling on lane No. 5 that the pinspotter had ceased to operate. Neals examined the machine and got it started again but the stoppage recurred and when Neals went to fix it the second time he noticed arcing and sparking around the pinspotter. Neals transferred the women bowlers to another lane and shut off the machinery of lane No. 5 by the "manager's switch" at the main desk. Neals testified that on both occasions the machine had "kicked out" by the operation of a thermal-overload safety device, and that he had informed Bogacki of the situation. Machine No. 5 was in use the following day, Saturday, on Sunday and also on Monday evening, October 18, the day of the fire.

Bogacki was in charge of the alleys on Monday evening. He testified that he, along with several others, shut down the alleys, turned off the "foul" and "trouble" lights, and "from there we * * * [went] to the manager's control box and shut the rest of the lights off in the building. * * *" These incidents took place about 10 P.M. The master control switch, the circuit-breaker, however, was not turned off. AMF had originally instructed Bogacki that the circuit-breaker, which would cut off all

electricity to the building, was never to be turned off. AMF insists that later instructions were given by it to Bogacki in 1962 that he should cut off all electricity from the building when it was empty by pulling the master switch. The nature of the instructions given and received by Bogacki was, of course, a question of fact to be determined by the jury.

Bogacki further testified that after he closed the alleys he went to a nearby restaurant operated by his father where he remained for about an hour, then joined his wife at their home, located about a thousand feet from the bowling establishment. He stated that he remained there for about ten minutes when he saw the electric lights dim. Desiring to determine whether his neighbor's lights were affected as well as his own he went upstairs, looked out the window and saw that the bowling establishment was on fire. His father testified that he closed his restaurant at about 11 P.M. and went to his apartment in the same building. He soon heard one of his employees pounding on his door shouting to him that the bowling building was on fire.

The Bogackis, father and son, testified that flames were shooting through the roof at the rear of the bowling building and above pinspotters Nos. 5 and 6. There were heaters and other electrical equipment in the building which conceivably could have caused the fire. Father and son testified that when they ran from their homes the fire was so advanced that it was impossible to enter the bowling building. By the time fire companies arrived, the building and its contents had been virtually destroyed.

The complaint was based upon negligence, but the pretrial statement of the Bogackis contains the following language: "At the time of trial, plaintiffs

---

1. These provisions of the lease, executed June 30, 1958, do not seem to have merited the consideration of the court or counsel and were not brought to our attention either during the course of oral argument or by the briefs of the parties. We, therefore, do not consider them here. Cf.

12A P.S. Section 2–316 and Section 1–102(3). But, cf. Boeing Airplane Company v. O'Malley, 329 F.2d 585, 590–593 (8 Cir. 1964). Cf. Vlases v. Montgomery Ward & Co., 377 F.2d 846, 849–850 (3 Cir. 1967), and notes 5 and 6 cited to the text.

will prove that defendant was guilty of a breach of its expressed and implied warranties. Plaintiffs will also prove that defendant was guilty of installing defectively designed equipment on plaintiffs' premises in that said equipment was designed and manufactured in such a manner so as to permit an electrical fire to occur in said equipment and in negligently failing to inspect the said equipment at the time the equipment was installed, principally the No. 4 and 5 pinspotters."

■ In their pretrial statement the Bogackis spoke of "expressed and implied warranties". Though they stated that

AMF was guilty of "installing defectively designed equipment" they made no mention of the application of the doctrine of "strict liability" or of the Uniform Commercial Code. The pretrial statement also alleged failure of AMF to inspect the bowling equipment. The parties agreed to dispense with pretrial aside from their brief pretrial statements.[2] At the trial the Bogackis produced sufficient evidence to warrant a submission to the jury of a finding that AMF's bowling equipment was defective and that the fire resulted from defective equipment.[3] The court, however, in respect to the bowling equipment charged the jury only on negligence. The jury

2. That this procedure is an undesirable one is demonstrated by hiatuses in the present record. It was not until October 3, 1967 (Doc. No. 28) that it was stipulated that AMF was a Delaware corporation with its principal place of business in the State of New York. There is nothing in the record to indicate where the lease was executed and in this connection we note that if it was executed in Delaware that that State did not adopt the Uniform Commercial Code on which Bogackis rely in part until 1967. No reference was made to the law of New York. The parties approached the case at bar as if Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), and Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, (1941), had never been written. See Campbell Soup Co. v. Wentz, 172 F.2d 80, 81 (3 Cir. 1948). We will apply the law of the forum. See Black & Yates v. Mahogany Association, 129 F.2d 227, 232–233, 148 A.L.R. 841 (3 Cir.), cert. den., 317 U.S. 672, 63 S.Ct. 76, 87 L.Ed. 539, 61 S.Ct. 1020, 85 L.Ed. 1477 (1942); American Type Founders v. Lanston Monotype Mach. Co., 137 F.2d 728, 729 (3 Cir. 1943); Chicago Pneumatic Tool Co. v. Ziegler, 151 F.2d 784, 788–789 (3 Cir. 1945). Cf. Scott v. Eastern Air Lines, Inc., 399 F.2d 14, 22–32 (3 Cir. 1968), citing with approval Griffith v. United Air Lines, Inc., 416 Pa. 1, 203 A.2d 796 (1964). The parties have treated the law of Pennsylvania as applicable and the case was tried on the basis of that law.

3. The Bogackis' principal expert was Emerson Venable and he was questioned repeatedly as to his examination of AMF

manuals and specimens of AMF equipment. He testified that the design of the machine, especially as to solenoids, relays, and other electrical connections, was defective. It was his view that substantial possibilities existed for a break-down of the electrical connections serving to close circuits and that such break-downs would cause sparking. He also took the view that the cotton composition of the carpeting used in the rear of the machines to arrange the pins in the elevator device was highly dangerous, as well as the composition of the pins themselves, being maple wood covered with lacquer. He pointed further to the inclusion of a rubber belt in the motor and cited five possible causes of belt slippage with attendant dangerous friction.

While Venable could not isolate the cause of the fire, he was able to point to the pinspotters themselves as the most likely cause. A plaintiff is not required to prove with certainty the cause of an accident. The Pennsylvania Supreme Court in Smith v. Bell Tel. Co. of Pa., 397 Pa. 134, 153 A.2d 477 (1959), held that plaintiff's obligation, with respect to his burden of proof ends with his putting evidence on the record sufficient to permit a reasonable man to find for him. It is not necessary that "every fact or circumstance point unerringly to liability * * *." 397 Pa. at 138, 153 A.2d at 480. Indeed the Supreme Court of Pennsylvania hinted at possible Constitutional issues arising from overbroad powers in the trial courts to take the case from the jury by "weighing" of inferences. Cf. Smail v. Flock, 407 Pa. 148, 180 A.2d 59 (1962), but see Antonson v. Johnson, 420 Pa. 558, 561, 218 A.2d 123, 124 (1966).

rendered a verdict in favor of AMF, and the Bogackis appealed.

## I.

On appeal the Bogackis contend that the court below committed prejudicial error in failing to charge on strict liability and warranty of merchantability but they submitted no specific requests for instructions, either written or oral and therefore must rely here on a prolonged discussion with the court when, at the end of the evidence, instructions to the jury were discussed. The first suggestion in the record that the doctrine of strict liability, Section 402A, Restatement 2d, Torts, applicable under the law of Pennsylvania, Webb v. Zern, 422 Pa. 424, 220 A.2d 853 (1966), might be available to the Bogackis came from the trial Judge himself and was not followed up by the Bogackis' two counsel. Counsel were pursuing a theory of warranty specifically pitched on the Uniform Commercial Code of Pennsylvania. Whether the warranty which was being pressed by Bogackis' counsel was warranty of merchantability or warranty of fitness for a particular purpose or even a common law warranty, remained obscure. Compare Sections 12A P.S. 2–314 and 12A P.S. 2–315 of the Uniform Commercial Code.[4, 5, 6, 7] We will assume *arguendo* at this point that the provisions of the Uniform Commercial Code apply to leases as well as to sales.

The Bogackis' counsel contend here that doctrine of strict liability and "warranty" are identical in legal effect; that "strict liability is merely the action for breach of warranty 'shorn of the verbiage and complications of warranty law.' ", citing LaGorga v. Kroger Co., 275 F.Supp. 373 (W.D.Pa.1967), and Kassab v. Central Soya, 432 Pa. 217, 246 A.2d 848 (1968). We find it unnecessary to decide this question for the decisive issue before us is whether the colloquy referred to is sufficient to avoid the impact of Rule 51, Fed.R.Civ.Proc., 28 U.S.C., which provides in part that "No party may assign as error the giving or the

---

4. Tr. at 628, et seq.

5. 12A P.S. § 2–314. "Implied Warranty: Merchantability; Usage of Trade

(1) Unless excluded or modified (Section 2–316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind or though not a merchant states generally that they are guaranteed. The serving for value of food or drink to be consumed either on the premises or elsewhere is a sale.

"(2) Goods to be merchantable must at least be such as

(a) pass without objection in the trade under the contract description; and

(b) are of fair average quality in the trade and within the description; and

(c) are fit for the ordinary purposes for which such goods are used; and

(d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and

(e) are adequately contained, packaged, and labeled as the agreement may require; and

(f) conform to the promises or affirmations of fact made on the container or label if any.

"(3) Unless excluded or modified (Section 2–316) other implied warranties may arise from course of dealing or usage of trade."

6. 12A P.S. § 2–315. "Implied Warranty: Fitness for Particular Purpose

Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose."

7. We take the Uniform Commercial Code of Pennsylvania as it was at the time of the execution of the lease between AMF and the Bogackis, viz., June 30, 1958, i. e., prior to its 1959 amendments. See again Boeing Airplane Company v. O'Malley, note 1, *supra*. But the result in the instant case will be the same whether one employs the pertinent sections of the Uniform Commercial Code as they were prior to the amendments of 1959 or as they are presently constituted.

failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection. Opportunity shall be given to make the objection out of the hearing of the jury."

We can make our decision only after an exhaustive analysis of the colloquy referred to.[8] We begin at the point where the court stated: "[T]he mere happening of a fire is not a breach of warranty or evidence of a breach of warranty * * *.", and "[T]here can be no implied warranty of fitness for a particular purpose [in this case] because there is no evidence that the pin setters were to be used for any other particular purpose than the ordinary use customarily made of pin setters." Thus far the Judge's statements were correct as a matter of both fact and law. Indeed he referred to the last sentence of the second comment of the "Uniform Commercial Code Comment," 12A P.S. Section 2–315, at p. 185, differentiating between shoes generally and shoes selected for the particular purpose of climbing mountains. Mr. Ziskind, one of the Bogackis' counsel then referred to an "inflammable" "dress" case, an obvious reference to LaGorga v. Kroger Co., 275 F.Supp. 373 (W.D.Pa. 1967), aff'd 407 F.2d 671 (3 Cir. 1969), to show that bowling equipment does not fulfill its function if it sets itself on fire. At this point, confusion of thinking arose respecting the "particular purpose" phrase of Section 2–315 and the "fit for the ordinary purposes" phrase of Section 2–314(2) (c). The trial Judge concluded erroneously that if a pinspotting machine "set pins in a bowling alley" that constituted a fulfillment of the warranty of merchantability, whether or not the machine set the bowling alley on fire while performing its task, for he stated that there was no evidence that AMF's pinspotters "were not of uniform average quality in the trade." But the burden of proof was, we think, on AMF to prove that pinspotters which set themselves on fire were of uniform average quality in the trade. In our opinion AMF did not meet this burden nor in our view could it have done so. The court reiterated its position, and Mr. Glasso, one of the Bogackis' counsel, had the following dialogue with the trial Judge: "Mr. Glasso: I don't think it's necessary that there must be any evidence of uniformity if there is a defect that causes harm to somebody, then it breaches the implied warranty. The Court: *It breaches which implied warranty?* Mr. Glasso: *That it is fit for the purpose for which it was intended, such as setting pins safely.* [Emphasis added]. The Court: It set pins safely, nobody was hurt by the setting of the pins. Mr. Glasso: That doesn't apply to the setting of the pins." In addressing the court Mr. Glasso did not use the word "Merchantability" nor did he speak of "the ordinary purposes for which such goods are used." See again Section 2–314(2) (c).

The court next referred to the "strict liability" provisions of Section 402A, Restatement 2d, Torts, as we have previously stated, indicating, however, that the instant case sounded in contract and not in tort. The Judge said: "Here you have got a contract relationship which had either express or implied warranty. No express warranties have been shown.", and "[T]here is no express warranty here so your warranty has either got to be merchantability or fitness for a particular purpose. Goods to be merchantable must be at least * * * fit for the ordinary purpose for which goods are used * * *. To get back to our fitness for the purpose assuming that there is a defect and when I get down to everything that Venable said the only defect in this machine was that the main power remains on while the machine is put in a rest position by the controls.[9] Now, that

8. Tr. at 628–646. See also Tr. at 708.

9. The statement of the trial Judge was incorrect. Venable testified to various other defects in the machines. See note 3, *supra*.

is enforced by the fact that the original manual said, 'Leave it [the master-control switch] on' and the change [the instruction not to leave the master-control switch on] occurred in '62 and was allegedly circulated in '63. Did the defendant take reasonable steps to notify its users, to inform its users, of this change in instructions? Now, how do we get a warranty out of that, a warranty of fitness for a particular purpose out of that?"

The Bogackis' other counsel, Mr. Ziskind took the position that the warranty he sought was one for a particular purpose stating in substance that there is a warranty of particular purpose "where the lessee relies upon the lessor who has superior knowledge and control of this equipment." See again Section 2–315. Mr. Ziskind's contention was erroneous. The court insisted, however, and correctly that there was no warranty of fitness for a particular purpose demonstrated by the record, saying that the Bogackis bought the bowling equipment "off the shelf". There followed further discussion between the court and Mr. Ziskind, the latter asserting correctly that it was not necessary to show negligence "under warranty" but the kind of warranty on which he relied was not specified by Mr. Ziskind. There followed another brief reference by the Judge to Section 402A of the Restatement of Torts and then Mr. Glasso asserted that he could see a ground for liability "on the implied warranty for fitness for which it [a bowling machine] was intended." But, again, he did not use the language of Section 2–314(2) (c) as to goods being "fit for the ordinary purposes for which such goods are used." He went on to say and rightly that pinspotters that "start on their own" demonstrate a breach of "an implied warranty". The court then asked, *"Of what?"* (Emphasis added) and Mr. Glasso replied "[O]f fitness for the purpose for which it is used", using as an example an automobile with defective brakes which might injure a passenger, used "for the particular purpose of transporting people * * *" Mr.

Glasso's phrase "for the particular purpose of transporting people," again does not conform with the language of *sub* "(c)" where as we have reiterated, the phrase "ordinary purposes" is employed. The court again referred to "particular purpose" and Mr. Glasso gave the same answer in substance that the pinspotters did not do their job safely. Mr. Ziskind also answered the court by referring again erroneously to a "particular purpose", that if a pinspotter picks up pins in the proper manner but at the same time starts a fire " * * * I don't think it's performing its particular purpose. * * *"

There was further discussion. Mr. Ziskind insisted that if a machine starts itself there is "a breach of warranty of fitness for the purpose" and the Judge replied that the pinspotters were not used for a "particular purpose" but for the "ordinary purposes for which such goods are used." Mr. Ziskind then asserted that the court would be in error if it ruled that if pinspotters started the fire, such a result would "not constitute a breach of implied warranty of fitness for the purpose." Again Mr. Ziskind did not use the language of Section 2–314(2) (c).

The court finally ruled that it would not charge as to a breach of "implied warranty of fitness for the purpose" in any form whatsoever. The court stated, "Merchantability I have never found here." but he said nonetheless "[A] lease carries an implied warranty." The Judge then stated again that "[N]o submission will be made [to the jury] under implied warranty." He in fact made no submission of warranty to the jury but in respect to the AMF equipment charged, as we have said, solely on the basis of negligence. After the charge and at sidebar Mr. Ziskind stated in reply to the court's request for objections: "[W]e wish the record to state that we object to the failure on the part of the Court to charge on warranties." Again there was no specification as to the kind of warranty relied on. The court noted the objection.

We cannot find that the provisions of Rule 51 have been complied with by the Bogackis. The "strict liability" issue was raised by them for the first time in this court and we have stated repeatedly we will not consider issues not raised in the court below. This is hornbook law. Quinones v. Township of Upper Moreland, 293 F.2d 237, 239–240 (3 Cir. 1961). As to warranty of merchantability, 12A P.S. Section 2–314, here relied on by the Bogackis, we cannot deem the extended and confused colloquy between the Bogackis' counsel and the trial Judge as the equivalent of a request for instructions that a breach of warranty of merchantability could be based on the evidence that the improper functioning of the pinspotters had caused the fire. The trial Judge might well have denied such a request in view of his misapprehension of the law but that did not relieve the Bogackis' counsel of making such a request in clear and unequivocal terms. Nor can we deem the objection to the instructions to be sufficient. The Bogackis' counsel referred only to failure to instruct as to "warranties" without specification as to the kind of warranty. Requests for instructions and objections to instructions must be made clear and distinct and cannot rest upon inference. It follows, therefore, that unless the doctrine of "fundamental error" be applied, Mazer v. Lipschutz, 327 F.2d 42 (3 Cir. 1963), and no such contention is made here by the Bogackis, their case must fail. We cannot conclude that the appeal at bar can be sustained on the doctrine of fundamental error. To so hold on this record would mean that verdicts in many cases in which counsel had failed to ask for instructions in accordance with the facts and the law would require reversal. We cannot accept this proposition.

In view of our ruling it is unnecessary to pass upon the issue of whether under the law of Pennsylvania a warranty of merchantability may be based upon a lease as well as upon a sale.

## II.

The Bogackis contend that the court below committed prejudicial error in refusing to permit the introduction in evidence of "Statistical Studies of the National Fire Protective Association, or experts' [sic] reference thereto showing an increase in bowling alley fires of 13% since the advent of electrical pinspotters." [10] The "Statistical Studies" referred to are attached to an "Engineering Report" of Venable's firm dated June 14, 1968. A preface states: "The chief cause of fires which originated in bowling alleys was defective wiring. Fires from this cause showed a considerable increase in numbers since the advent of the electrically operated pin setter." There follows a heading, "CAUSES OF FIRES", which states "Electrical fires in automatic pin setters which have come into widespread use in later years, have brought the figures [of electrical fires] up to 34.6% [from 29%]." There are also three examples of fires in bowling alleys resulting from electrical pin setters set out, all of them totally unrelated to the case at bar. There follows a section in the "Statistical Studies" entitled "Known Causes of Bowling Alley Fires", stating that "electrical causes" of fire are 34.6% of known bowling alley fires and of this 34.6%, 13.3% are caused by automatic pin setters. The "Statistical Studies" are in fact little more than a summary. Cf. Pritchard v. Liggett & Myers Tobacco Co., 295 F.2d 292, 301 (3 Cir. 1961).

It seems, although it is far from certain from the confused statements in the transcript of the trial, that the Bogackis' counsel, Mr. Glasso, first desired to have the "Statistical Studies" introduced in evidence but if his first purpose failed sought to have Venable employ the "Statistical Studies" as a basis for his proposed expert testimony. Venable was examined exhaustively in respect to the "Statistical Studies," and it became apparent that he could not testify of his

10. See the index to the Bogackis' principal brief.

own knowledge as to the nature and extent of the source from which the statistics were gathered. It follows that the "Statistical Studies" could not be introduced in evidence under Professor Wigmore's "Learned Treatises" hearsay exception and that Venable, lacking the necessary testimonial qualifications, could not be permitted to base his testimony on items of the "Statistical Studies." See 6 Wigmore, *Evidence* Section 1690, *et seq*. (3d ed. 1940).

The operative facts of the case at bar are very different from those in Grantham v. Goetz, 401 Pa. 349, 356–357, 164 A.2d 225, 228–229 (1960), where the Supreme Court of Pennsylvania permitted the "literature" accompanying the drug "Levophed" furnished by its manufacturers, setting forth cautions and warnings to be adhered to in the administration of the drug, to be introduced in evidence for the limited purpose of reading and comment by expert medical witnesses. The "Statistical Studies" are in no wise comparable to the "Levophed" literature for the former consists, insofar as admissible in the instant case, of mere statistical conclusions. The "offer" or "offers"[11] were properly rejected.[12]

### III.

■ Sergeant Paxton, a fire marshal of the Pennsylvania State Police, testifying for AMF, stated that in his opinion the fire was incendiary in origin. We believe the Sergeant's standing as an expert in the field of incendiary fires was sufficiently established for it appeared that he had a "reasonable pretension to specialized knowledge on the subject un-

der investigation." De Marco v. Frommyer Brick Co., 203 Pa.Super. 486, 490, 201 A.2d 234, 236 (1964). See also Moodie v. Westinghouse Elec. Corp., 367 Pa. 493, 501, 80 A.2d 734, 738 (1951). The court insisted that Paxton should confine himself in his first testimony to the physical evidence on which he based his opinion. That physical evidence was adequately summed up in the following hypothetical question: "[A]ssuming, Sergeant Paxton, that the owner-proprietor of this building, Jack Bogacki, has testified that he closed the building approximately one hour before he made any personal observations that a fire was, in fact, going on in the bowling establishment and assuming that when he closed the building he smelled no fumes of any lacquer or any gaseous substance in the buildings; and assuming that within one hour of the time that he closed the building, he observed flames at the one-third rear portion of the building which had already consumed approximately 50 feet of the roof, which flames were leaping approximately 15 feet high above the roof of the building; and assume further that an attempt was made very shortly thereafter to enter the building but because of extreme smoke and heat access was not able to be made, assuming those facts to be true and from your investigation and your testimony of what you found at the scene I will ask you whether or not you have a professional opinion as to cause of this fire?"

\* \* \* \* \* \*

"Sergeant, I am going to rephrase my question to you as a preface thereto and without attempting to summarize your

---

11. It is not clear on what ground the trial court rejected the Bogackis' proposals. An examination of the record discloses no exact or formal offer or any precise rejection.

12. The offering of the "Statistical Studies" for any purpose was not in accordance with Rule 5(II) (C)2(b) of the Rules of the United States District Court for the Western District of Pennsylvania which requires notice to be given as specified prior to the trial if documents are to be used as evidence.

In the instant case the first indication that Venable would rely on the Association report was contained in a report he filed at the beginning of the week in which he was to testify. The trial court would have been justified in excluding the report or any reference to it on this ground alone, despite the liberal policy of Rule 46, Fed.R.Civ.Proc., 28 U.S.C. It is not clear, however, that the trial Judge based his rejection on the failure to conform with Rule 5(II) (C)2(b).

testimony, you have testified as to the existence of a side door, that you found the existence of two cans, empty 5-gallon cans, inside the door uncapped, a major charring area in the location of the No. 2 and over by No. 7 and 8. I now with those facts in mind ask you are those facts that you personally observed yourself in your investigation"

\* \* \* \* \* \*

" \* \* \* [N]ow, assume that the proprietor of this building closed the building down and that at the time of closing he smelled no fumes of gas, excuse me, any fumes or lacquer or of any other gaseous contents; that approximately an hour to an hour and a half after leaving the building he observed a red glow over toward the bowling alley; that he observed flames coming from the roof of the building approximately 12 feet from the rear of the building and toward the right of the center of the roof and assuming that the flames that he observed were approximately 15 feet in height I ask you, and assuming further, sir, that shortly thereafter the proprietor and others attempted to enter the building but were unable to do so because of the intense heat and smoke, I ask you based upon all of what you observed and those assumptions whether or not you can give a professional opinion as to the cause of this fire?"

The Sergeant stated, basing his opinion on the hypothetical question, that the fire was of incendiary origin. Thereafter he testified to certain obligations of Bogacki's which he had learned from interviewing Bogacki himself. It also ap-

pears from the record that AMF had claims against the Bogackis for nonpayment of notes for rental of the AMF equipment. These had been embodied in a counterclaim filed by AMF.[13]

The Bogackis contend that Sergeant Paxton's testimony was without proper evidentiary foundation. We cannot agree. Though the Sergeant's evidence was considerably weakened by cross-examination, the issue of credibility was for the jury and his conclusion as an expert had a sufficient evidentiary basis. See Commonwealth v. Greenberg, 143 Pa. Super. 203, 17 A.2d 698, 701 (1941), Commonwealth v. Nasuti, 180 Pa.Super. 279, 284, 119 A.2d 642, 643–644 (1956), and Commonwealth v. Oister, 201 Pa. Super. 251, 254–256, 191 A.2d 851, 852–853 (1963), rev'd on other grounds, 378 U.S. 568, 84 S.Ct. 1926, 12 L.Ed.2d 1038 (1964).[14]

We have examined all other issues raised by the Bogackis on this appeal not hereinbefore referred to and find them to be without merit.

Accordingly, the judgment will be affirmed.

FREEDMAN, Circuit Judge (dissenting).

I respectfully dissent.

We are agreed that in the circumstances there existed an implied warranty of merchantability under § 2–314(2) (c) of the Uniform Commercial Code.[1] In my view the absence of a charge on the implied warranty was the result of the trial judge's misapprehension of the

---

13. The counterclaim was settled and we are not concerned with it in any way other than as evidence of the Bogackis' indebtedness.

14. The decisions cited are in criminal proceedings in which the defendants were indicted for arson. *A fortiori* the principles enunciated therein are applicable in civil cases such as that at bar. In Oister v. Pennsylvania, the reversal by the Supreme Court of the United States was

based upon the failure of the Commonwealth to allow the defendant a Jackson v. Denno hearing, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).

We also point out that in a federal proceeding the rule of evidence most favorable to the reception of evidence governs. Rule 43, Fed.R.Civ.Proc., 28 U.S.C.

1. Act of April 6, 1953, P.L. 3, § 2–314, as amended, 12A Purdon's Pa.Stat.Annot. § 2–314.

nature of the warranty and not of appellants' failure to make adequate objection under Rule 51 of the Federal Rules of Civil Procedure. I consider the error fundamental and therefore would notice it despite any failure to comply with Rule 51.[2]

It is true, as the majority opinion demonstrates, that appellants' counsel incorrectly labeled the warranty as one of fitness for a particular purpose rather than of merchantability.[3] I think this is not significant for a number of reasons.

1. Again and again in the colloquy, which is detailed in the majority opinion, appellants' counsel made it plain that the fundamental basis of their contention was that an implied warranty existed that the machine would perform its normal work without being set afire. Their reference to the warranty as one of fitness for a particular purpose therefore was an insignificant error in name only and not a matter of any substance.

2. The trial judge was not misled by the wrong label put on the claim of breach of warranty. He would have arrived at the same result even under the correct label, for his refusal to charge on warranty was based on his misapprehension of the law. He believed that so long as the machine adequately set pins there could be no breach of warranty of merchantability, even if the machine was set afire. It is this erroneous view, rather than a misnaming of the warranty by counsel, which led to the trial judge's refusal to charge on any implied warranty.

3. The specific element of breach of warranty on which appellants relied, i. e., that the machine was set afire by its normal operation, is one which would have been common to both warranties. The label under which this crucial element was described therefore did not mislead the trial judge nor did it fail to give adequate notice of the real nature of the plaintiffs' claim.

It seems to me unjust to hold that one whose place of business was burned down by machinery which set itself on fire cannot rely on the breach of implied warranty because he called it one of fitness for a particular purpose instead of merchantability for general use, when in either case the fire would constitute a breach of warranty. This was especially true here, since the trial judge stated that he would not charge on the implied warranty of merchantability which we now say appellants were required to specify.

I therefore believe it was fundamental error to fail to charge on breach of the implied warranty of merchantability, and we should notice the error here, even if the requirements of Rule 51 were not met.

I have assumed, as has the majority, that the present transaction of lease falls within the Uniform Commercial Code. Since I would remand the case for a new trial because of the failure to charge on implied warranty, the parties would have the opportunity to present any further evidence as to the nature of the transaction and to argue the applicability of the Uniform Commercial Code.

Section 2–315 of the Code provides that where the seller has reason to know any particular purpose for which the goods are required and the buyer relies on his skill or judgment to sell or furnish suitable goods, there is an implied warranty "that the goods shall be fit for such purpose."

---

2. See, e. g., Paluch v. Erie Lackawanna Railroad Co., 387 F.2d 996 (3 Cir. 1968).

3. Section 2–314(2) (c) of the Uniform Commercial Code provides that to be merchantable goods must at least be "fit for the ordinary purposes for which such goods are used."