IHRIE ET AL. *v.* ANTHONY, USE OF HERSELF AND GOVERNMENT EMPLOYEES INSURANCE COMPANY

[No. 175, October Term, 1953.]

*Decided August 5, 1954.*

The cause was argued before BRUNE, C. J., and COLLINS, HENDERSON and HAMMOND, JJ.

*J. Gilbert Prendergast*, with whom were *Clark, Thomsen & Smith* on the brief, for the appellants.

*Paul F. Due*, with whom were *David K. Ebersole, Jr.*, and *Due, Nickerson, Whitford & Taylor* on the brief, for the appellee.

BRUNE, C. J., delivered the opinion of the Court.

The defendants appeal from a judgment for $20,000 rendered on the verdict of a jury in a suit brought by the plaintiff to her own use, and to the use of the carrier of her automobile collision insurance, to recover for personal injuries sustained by her in an automobile accident and for damages to her automobile.

The plaintiff was driving her automobile, a 1949 Chevrolet two-door sedan, on the Washington Boulevard near Elkridge, in Howard County, at about 4:30 P.M. on July 23, 1951, and had stopped at the intersection of that Boulevard and Montgomery Road because of a traffic light which had turned red. Her husband was sitting beside her. While they were waiting for the traffic light to change, a truck owned by the defendants and driven by a sixteen year old boy employed by them as a truck driver ran into the rear of the plaintiff's car. The plaintiff and her husband were both injured. She testified that she was thrown forward by the impact of the collision, that her right knee struck the dashboard and that when she came back (from being thrown forward), her head "snapped." Damage to the plaintiff's car was extensive. Among other things, the seats were torn loose from the floorboards and the front seat arms made of one and one-eighth inch steel tubing were bent. The cost of repairs to the car was about $680.00.

The plaintiff testified that immediately after the crash her neck started to swell and her husband tore off a necklace which she was wearing and which was choking her.

The plaintiff and her husband were taken to a hospital in Baltimore and were examined by a doctor on duty in the accident department. At that time the plaintiff was more concerned over her husband's condition than her own. He was kept at the hospital overnight and she stayed there to be near him, but not as a patient. The doctor who examined her stated that she complained of a little soreness in her neck and in one knee. He testified that her examination was negative and that no treatment was given her. She testified that he had told her there was nothing wrong with her.

For about a week or so, according to her testimony, she suffered severe headaches and pains in the head, neck and knee. About two weeks after the accident, on August 8th, 1951, she suffered "the most terrific pain" in the back of her head and down one side. Her husband then took her to see her family physician in Baltimore, Dr. Michael Abrams. He gave her some medication, ordered her to bed and told her she should be x-rayed. She returned on August 10th, still complaining of pains in similar areas.

At about that time the plaintiff's husband got work in Norfolk, Virginia, and she went there with him for about two months during which she had a number of diathermy treatments. On returning to Baltimore she again visited Dr. Michael Abrams, and at his suggestion had x-rays taken by his son, Dr. Robert C. Abrams, an orthopedist. Other x-rays were later taken by others. There was a narrowing of one intervertebral space in the cerivcal (neck) region. In March, 1952, her head was put in traction to stretch the neck; and after that treatment, Dr. Robert Abrams prescribed a "Thomas collar", which is a kind of brace designed to serve the same purpose.

Dr. Robert Abrams' testimony shows that in addition to a narrowing of the intervertebral space, there was also the beginning of some arthritic change in the way of little spurs, which he described as "Nature's way of

trying to build up support to prevent too much motion when discs are damaged."

The plaintiff had a severe attack of pain on February 27, 1952, and Dr. Michael Abrams was called to attend her then. She had another severe attack while at Ocean City in June, 1952, and still other attacks in February, May, August and October, 1953. The last of these occurred about a month before the trial of this case.

The plaintiff was examined by two other doctors. One of them examined her at the request of her counsel, the other at the request of the defendant. Both were called by the defense.

Much of the medical testimony elicited by the defendants, was to the effect that the narrowing of the intervertebral space was a natural degenerative process due to the age of the plaintiff and that there was no evidence of herniation or rupture of a disc. On the other hand, Dr. Robert Abrams testified: "I feel that the complaints, the condition which Mrs. Anthony [the plaintiff] has was caused by an accident, that this accident for which I treated this patient either caused the localized damage or greatly aggravated the possibility of some damage having been there before."

Dr. Robert Abrams also testified that it was his opinion that the plaintiff's condition would not improve; that it would either remain stationary or get worse. He recommended hospitalization for about four weeks for observation and "conservative" treatment and estimated the cost at $800 to $1,000. He doubted the need for surgery.

The plaintiff was not employed at the time of the accident and had not been for several years. She had done office work in Baltimore for seven or eight years prior to 1942, and her salary was $55.00 a week. In Norfolk she worked from 1942 to 1945, but her compensation is not stated. She also worked for a real estate developer there in 1947 and 1948 and received a salary of $45.00 a week, plus some benefit (presumably housing accomodations) from living on the development and a bonus when the work was finished. After the

accident involved in this suit, and after her husband had left her, she tried working as a door-to-door canvasser for a real estate concern, but found that she could not stand it and gave it up after about two days. There is testimony by several doctors that the plaintiff could do clerical work if she could sit up-right. There seems to be some question as to how much bending over she could do in the course of such work. There is also dispute as to whether she needs to continue to wear the Thomas collar. The plaintiff herself claims that she cannot get along without it. There is also evidence that she will continue to be subject to "attacks". The medical testimony strongly indicates that she tends to exaggerate her ailments.

The appellants, while not denying liability, challenge the sufficiency of the proof of damages for loss of earnings and the instructions of the trial court with regard thereto. They concede that the instruction is in the usual form which originated with *Stockton v. Frey,* 4 Gill 406, but claim that there is no competent evidence to support it.

The testimony of Dr. Robert Abrams indicates that, in his opinion, the plaintiff's condition will not improve and that she will remain subject to recurrent attacks, and seems to be sufficient evidence of the permanence of her injury to warrant the submission of that matter to the jury. *Montgomery Bus Lines v. Diehl,* 158 Md. 233, 148 A. 453.

The appellants next attack the instructions pertaining to damages on the ground that the declaration, even as finally amended during the trial, made no claim for any loss of earnings prior to the trial and that the trial court, therefore, should not have permitted damages to be recovered for any such loss. This objection, if raised in the trial court, could readily have been met by an amendment. A careful examination of the appellants' objections to the Court's instructions shows, however, that this ground of attack was not included among them. That being so, it cannot be raised in this Court. *General*

*Rules of Practice and Procedure,* Part Three, III, Rule 6 (d).

It is also contended by the appellants that there was no competent evidence of lost earnings upon which the jury could base any award of damages. This contention rests largely upon the fact that the plaintiff was not employed at the time of the accicdent and had not been employed for several years prior thereto. As above stated, there was evidence of past earnings of the plaintiff, and it was admitted without objection.

The fact that the plaintiff was unemployed at the time of the accident and for several years prior thereto is not fatal to her right to recover. *Miller v. McCoy Truck Lines* (Iowa, 1952), 52 N. W. 2d 62; *McIver v. Gloria* (Texas), 169 S. W. 2d 710; *Germ v. City of San Francisco,* (Cal.), 222 P. 2d 122; *15 Am. Jur., Damages,* Section 91, page 502. In *Baltimore Transit Co. v. Castranda,* 194 Md. 421, 71 A. 2d 442, this Court held that there was no prejudice in admitting evidence relating to a business in which the decedent had engaged as a sideline for only about eight months in the year preceding that in which he was killed in the accident which gave rise to the suit, and which business had been sold in that preceding year. This Court also commented that the trial judge had "fully instructed the jury concerning the various factors to be taken into consideration in determining the amount of damages."

Testimony with regard to the appellee's earnings goes back over a number of years, and the position of the appellants seems to be that its remoteness (perhaps plus the appellee's not having been employed for three or four years before the accident) is so great that the jury had no basis upon which to make an award of damages for loss of earnings. They cite *Waltring v. James,* 136 Md. 406, 111 A. 125, but that case is not controlling because the evidence of past earnings there held properly excluded related to only two periods of temporary employment, one of which was about three years and the other about eight years prior to the acci-

dent. In the instant case, the appellee had been employed regularly and for comparatively long periods of time. We do not consider the evidence as to the plaintiff's past earnings too remote to serve as a basis for computing her loss of earnings as a result of injuries sustained in the accident. Her last work as an employee of the City of Baltimore and all of her work in Norfolk were within about ten years prior to the accident. See *Ehrgott v. Mayor, etc. of New York,* 96 N. Y. 264; *Missouri Pacific R. Co. v. Gilbert,* (Ark.), 178 S. W. 2d 73; Annotation on *"Admissibility, as against Objection of Remoteness, of Evidence as to Past Earnings upon Issue as to Amount of Damages in Action for Personal Injury or Death,"* 130 A. L. R. 164, and the cases therein cited upholding the admissibility of evidence of past earnings. The problem faced by a jury aided by such evidence would seem to be less difficult than that of estimating the impairment of adult earning capacity of a thirteen month old child injured in an accident, as in *Virginia R. Co. v. Armentrout* (C. A., 4th, W. Va.), 166 F. 2d 400, 4 A. L. R. 2d 1064, which outlines the basis for fixing damages on a new trial.

Much of the appellants' attack on this phase of the instructions of the trial court seems to stem from medical testimony to the effect that the plaintiff could do clerical work and from the argument that since this was the only type of work in which she was experienced, she really has suffered no loss at all. To press this argument in support of the claim that there was no sufficient evidence by which to gauge the plaintiff's loss would be to ignore the difference between the question of whether or not there was in fact a loss, and the question of whether or not there was a sufficient measure by which to determine its extent, if a loss had in fact been incurred. Evidence to deny the fact of loss, when rejected for that purpose, cannot rise phoenix-like to disprove the existence of a *measure* by which to compute loss.

We are of the opinion that there was sufficient evidence of the permanence of the plaintiff's injuries and of their

impairing her earning power to warrant the submission of those issues to the jury and that there was sufficient evidence to serve the jury as a guide in measuring the extent of her loss of earnings.

The appellants next assail the instructions on the ground that they permitted the jury to award damages for past hospital expenses, although there were none. This objection isolates a portion of the charge from its context. The charge permitted the jury in determining damages to consider "such sums as the Jury find she has been required to expend in the past and will be required to expend in the future for hospital and medical attendance in consequence of said injuries." The testimony showed that the appellee had incurred medical expenses, that she had paid a part of them and that her orthopedic doctor recommended future hospital treatment, which he estimated would cost about $800 to $1,000. These figures were not controverted by any testimony. The suggestion of the appellants that the appellee's hospital expenses for an appendectomy might conceivably have been included in the award under such an instruction is untenable, especially in view of the clear testimony that the automobile accident had nothing to do with the appendectomy. There was testimony that the appellee would need further medical attention as well as hospitalization. The lumping together in one sentence of hospital and medical expenses is not improper, and there seems to be no reason to suppose that the jury was misled because such expenses for the past and for the future were not segregated. Consequently we do not think that this instruction was prejudicial to the defendants.

There are three rulings on evidence to which the appellants press their objections.

The first deals with a question put on cross-examination to an expert medical witness called by the defendants. The question was this: "You do think she had some injury to her neck at the time the accident happened?" This doctor had examined the plaintiff on

two separate occasions and had done so at the request of the defendants. He had taken a "history" from the plaintiff, but not for the purpose of treating her. His reply to the above question was: "Well, I have no reason not to believe and place full credence in what the patient told me." The appellants point out that this doctor had no personal knowledge of the accident, and they claim that the effect of this question and answer was to convert the doctor from an expert witness into a character witness as to the veracity of the plaintiff. The appellants also assert that in passing on the plaintiff's veracity, the doctor was called upon to invade the function of the jury.

The question appears to have been called forth as a result of the doctor's direct examination. During that portion of his testimony he twice referred to her "alleged injury," and on one of these occasions added to "alleged injury" the qualifying phrase "that she may have had to her neck." The doubt which his own words had created with regard to there having been any such injury due to the accident, plus the fact that he had examined the plaintiff and had examined x-rays of her neck, made it proper for the plaintiff to pursue this matter on cross-examination in order to clear up the doubt. If the doctor's denial of disbelief of the plaintiff's claim that her neck had been injured in the accident made him a character witness for her on the score of veracity and also amounted to a usurpation of the function of the jury in passing on her veracity, then his expressions of doubt must also have transgressed in like manner, though with opposite effect. The appellants introduced the testimony suggesting doubt. It would seem strange that they should have immunity from cross-examination on it, even if their present contentions were well founded. We do not, however, so regard them; and it is perfectly evident from the reading of the whole testimony of this witness that he did not accept all of her statements with regard to injuries and suffering

at anything approaching full face value. Quite the contrary, he thought she was given to exaggeration.

The next objections are to the cross-examination of the appellants' medical expert on a portion of the deposition of the plaintiff's attending physician, who was unable to be present in court.

We think that the contention that he was asked to testify in part upon the opinion of another doctor is not supportable. It seems to rest upon the first doctor's statement that if someone merely walked across the floor it upset the plaintiff while she was in the midst of an attack. This was more a matter of observation than opinion. Hence the rule that a medical expert may pass an opinion upon the facts testified to by another medical expert is applicable. See *Quimby v. Greenhawk,* 166 Md. 335, 171 A. 59; *Mount Royal Cab Co. v. Dolan,* 168 Md. 633, 179 A. 54, where this rule is recognized, but was found inapplicable.

The question, we think, as limited by the trial court, met the test of a proper hypothetical question. The question was directed to one attack which the plaintiff suffered. The testimony that the attack did occur was uncontradicted. (It was also confirmed by a later witness.) The question was based upon the testimony of the plaintiff's attending physician with regard to that attack and upon his medical records or case history pertaining to this patient and covering the two months preceding that attack. This history of the last two months involved no highly colored adjectives. The witness was asked to express an opinion as to the cause of the attack as described on the assumption that it did occur and that the attending physician's testimony was all true. In answering the question the witness brought in one other fact which he stated as something which he knew. Numerous cases on hypothetical questions are fully reviewed in *Gordon v. Opalecky,* 152 Md. 536, 137 A. 299. As is there said, "Such questions are usually and properly asked in one of two ways. One is where the evidence is uncontradicted and the witness has heard

or read it. In such a case he is asked to express an opinion predicated upon the assumption that the evidence thus known to him is true." See also *Langenfelder v. Thompson* 179 Md. 502, 20 A. 2d 491, 136 A. L. R. 960. We do not find any such coloring of the facts as to bring this case within the condemnation of *W. B. & A. R. Co. v. Kimmey*, 141 Md. 243, 118 A. 648.

The final objection is also to a question asked on cross-examination of the same medical expert called by the appellants. He had taken a history from the plaintiff at the time when he first examined her and had recorded it "of course," as he testified, as a part of that examination. The question was whether certain statements recorded in that history were symptomatic of injured intervertebral disc. In his direct testimony this witness had stated that at the time of the plaintiff's alleged injury she probably had a forceful whiplash type of injury to her neck. He was then asked what he based that on and replied, "By what she told me. This type of injury can damage intervertebral discs * * * but the patient's persisting symptoms are not truly characteristic of herniated or ruptured cervical disc." One of the issues in the case was whether the accident might not have aggravated an existing condition in the disc in question. Bearing this in mind and with the doctor's own reference to this type of injury damaging intervertebral discs, no reason is apparent why the plaintiff, on cross-examination, should not have pursued this line of inquiry. This view is strengthened by the doctor's further testimony contained in the same answer that he thought from the x-rays that the change in the plaintiff's disc was of a degenerative type with early hypertrophic arthritis, and that "There may, of course, have been some aggravation of this pre-existing condition."

Finding no error in either the instructions or the rulings on evidence excepted to, the judgment is affirmed.

*Judgment affirmed, with costs.*