## Grantham, Appellant, *v.* Goetz.

350

Argued April 28, 1960. Before BELL, MUSMANNO, JONES, COHEN and EAGEN, JJ.

*Donald F. Spang,* with him *Robert F. Shapiro,* for appellant.

*James W. Stoudt,* with him *Rhoda, Stoudt and Bradley,* for appellee.

*Mark C. McQuillen,* with him *Norman E. Dettra, Jr.,* for appellee.

OPINION BY MR. JUSTICE EAGEN, October 10, 1960:
This is an appeal from the refusal of the court below to remove a compulsory nonsuit. The plaintiff alleged malpractice on the part of the two appellee-doctors in the course of treatment given the appellant while he was a patient in a hospital in Reading, Pennsylvania.

The appellant suffered a severe chemical burn of the leg, as a result of the extravasation of a drug administered intravenously during the course of his treatment for severe shock. He charges the defendants with negligence, specifically, in failing to provide the attention and standard of care the circumstances required.

The appellant was brought into the emergency room of the hospital late in the afternoon of January 5, 1955. He was unconscious, critically ill with a very faint heart beat and very low blood pressure. He was hovering between life and death. He was given emergency treatment by the chief resident physician. Part of the treatment included the intravenous administration of a drug known as Levophed in a glucose solution. This drug is a blood vessel constrictor utilized to increase the blood pressure in cases of shock. About 5:45 p.m., he was removed to the men's medical ward and the same treatment was continued. He was also placed in an oxygen tent.

The appellee-Lloyd was an intern in the hospital, and he assumed charge of appellant's case upon the latter's arrival in the ward. He subjected the appellant to a thorough examination to determine, if possible, the cause of his condition. Dr. Lloyd remained on continuous duty until five o'clock the following afternoon, January 6th.

The original administration of the drug was into the arm of the patient but this was discontinued about midnight on January 5th, when the patient manifested a satisfactory response by regaining consciousness, normal pulse and blood pressure. About six o'clock the following morning, the patient's condition appeared to be deteriorating. He again lost consciousness and the administration of the drug was resumed. This time, however, the collapse of his circulatory sys-

tem rendered injection through the arm impossible, necessitating administration of the drug through a cut-down to a vein in the lower right leg, where a soft polyethylene catheter was inserted approximately six to eight inches into the vein. This cutdown was performed about seven-thirty o'clock, a.m., by a medical member of the staff assisted by Dr. Lloyd.

The appellee-Goetz was chief of the medical staff of the hospital. About ten o'clock on the morning of January 6th, he visited the men's medical ward with a consulting staff. The purpose of the visit was to examine all of the patients in the ward and to make recommendations as to the modification or the continuation of the treatments being given to the patients.

The administration of the drug continued through the day of January 6th. Dr. Lloyd attempted to slow or discontinue the administration of the drug on some occasions, but each time the patient's response indicated the necessity of its continuance.

About five o'clock p.m., of January 6th, Dr. Lloyd went off duty and the intern then in charge was briefed as to appellant's condition. About six-thirty o'clock, p.m., according to the hospital chart, a nurse noticed that the intravenous flow had slowed and the vein was becoming edematous. The intern was called and he observed that the infusion was infiltrating into the tissue surrounding the vein. He immediately (about seven o'clock, p.m., according to the chart) shut off the administration of the drug, and a substituted course of treatment was instituted to support that already given. This charted data is at variance with the testimony of the appellant's wife, who testified (with some uncertainty as to the exact date) that it was she who first noticed a blister on her husband's leg in the area of the injection site about three-thirty o'clock in the afternoon; that she called it to the attention of the

only nurse in attendance in the ward at the time; and, that a doctor did not appear to provide attention for a period of one-half hour to one hour's time.

On the early morning of January 7th, the patient regained consciousness. The treatment saved his life, but, as a result of the infiltration of the Levophed into the tissue, a blister formed and skin and tissue were burned. Surgery was necessary, consisting of a cutting away of the tissue, scraping of the bone, and grafting of skin onto the leg at the location of the wound. Months of disability followed.

Dr. Lloyd, called as on cross-examination, testified that he saw the appellant three or four times between midnight and six o'clock, a.m., of January 6th; that he assisted in the above-described cutdown; that he remained in continuous attendance at appellant's bedside from six to nine o'clock, a.m. He saw him again briefly at ten o'clock, a.m., and visited him three times between ten and one o'clock. He was with him constantly from two-thirty to three o'clock. He saw him again at four o'clock and later at five o'clock just before he was relieved of duty. During the last visit, he was accompanied by a Dr. Dersch, the intern who assumed charge during Dr. Lloyd's rest period. Both doctors examined the appellant's leg at this time and saw nothing of a swollen nature and noted that the intravenous flow was progressing as planned. The chart showed that between seven-thirty, a.m., and five, p.m., of January 6th, there were twenty-five recordings of appellant's blood pressure.

Dr. Lloyd further testified that Levophed is a potent drug and that a patient, who is receiving this treatment, should have maximum, constant attention. He said there were ten patients in the ward on the occasion involved. There were on duty in and about the ward a head nurse, another registered nurse, four stu-

dent nurses and two nurses' aides. The head nurse's desk was only a few feet removed from the location of appellant's bed.

A medical expert was called by the plaintiff-appellant. He testified that a person receiving Levophed should have constant attention by someone whose duty it would be to observe infiltration, blood pressure and the patient's general condition. He was asked in the form of a hypothetical question, containing the essential details of Dr. Lloyd's testimony, whether or not the care given appellant amounted to "constant attention" and he answered that, in his opinion, the appellant received "constant attention" and that the practice followed in this case was good medical practice.

The facts above graphically indicate the correctness of the court's order entering a compulsory nonsuit. In order to sustain this action of alleged malpractice, it was incumbent upon the plaintiff to prove that the defendants did not exercise the care and judgment required of reasonable men in like circumstances: *Donaldson v. Maffucci*, 397 Pa. 548, 156 A. 2d 835 (1959). The proof utterly failed to establish this fact.

Dr. Goetz had no connection with this patient except on the occasion of the one visit during the morning of January 6th, when he examined him and approved the continuation of the treatment already begun. Dr. Lloyd rendered excellent, dedicated and faithful service to the appellant, which undoubtedly saved his life. The facts, established by appellant's own proof, belie the charge that proper care and attention were not given. Appellant's own expert medical witness definitely negated this charge and could hardly have testified otherwise.

There isn't a scintilla of evidence in the record to establish how the drug escaped from the vein into the tissue. The testimony fails even to hint that any act

of omission or commission on the part of either defendant caused this to happen. The claim is completely devoid of merit.

This issue is ruled by *Donaldson v. Maffucci,* supra, and *Robinson v. Wirts,* 387 Pa. 291, 127 A. 2d 706 (1956). In the latter case at 294, 295, Mr. Chief Justice STERN aptly said: ". . . no presumption or inference of negligence arises merely because the medical care or surgical operation terminated in an unfortunate result which might have occurred even though proper care and skill had been exercised, and where the common knowledge or experience of laymen is not sufficient to warrant their passing of judgment. In such cases the doctrine of res ipsa loquitur or of exclusive control may not be invoked, and expert testimony in support of the plaintiff's claim is an indispensable requisite to establish a right of action." The only expert testimony produced by the plaintiff failed to supply this required proof and succeeded only in completely refuting the very conclusion sought to be elicited.

Appellant also argues that the trial judge rejected certain evidence which should have been admitted.

It appears that before he sued these particular defendants, appellant instituted an action for damages against the hospital. In this suit, depositions were taken of the present defendant, Dr. Goetz, under Pa. R. C. P. 4007. The witness (Dr. Goetz) was not a party to that action and, at that time, had not been sued. In the trial of the present action, Dr. Goetz was called as a witness by the appellant as for cross-examination. In the course of this examination, appellant's counsel proposed to question Dr. Goetz upon answers given by him, as a deponent, to inquiries in the suit against the hospital. While the deposition of Dr. Goetz, taken as related above in the suit instituted by

the plaintiff against the hospital, was not made a part of the record in the instant appeal, we have read and studied it with care. Such is our right. *Galbraith v. Zimmerman,* 100 Pa. 374 (1882). We find nothing therein which could, in any way, be considered contradictory to any statement given by Dr. Goetz in his testimony in this case. Nor did appellant's counsel, upon his attempted usage of it in the trial below, indicate what statement it was that Dr. Goetz made during the trial that he was desirous to contradict. Nor are there disclosed in this deposition any additional circumstances or factors which would strengthen the evidence presented and thus warrant the conclusion that the issue of defendants' negligence was a jury question. Under the circumstances, therefore, even if we were to assume that the lower court's ruling, in refusing plaintiff's counsel the opportunity to cross-examine the witness by confronting him with the testimony he gave as a deponent, was technically erroneous, our remanding of the case for retrial for this reason alone would, in our opinion, be a futile gesture. The error, if any, was clearly harmless.

Counsel for appellant also complain that the court erred in refusing to admit certain proposed exhibits into the evidence for all purposes. These consisted of literature accompanying the drug Levophed, were furnished by its manufacturers and set forth cautions and warnings to be adhered to in the administration of the drug. These exhibits were admitted into evidence for the limited purpose of reading and comment by the expert witnesses. The jury was not permitted to view the exhibits. Dr. Foley, a doctor of medicine and medical director of the laboratories which manufactured the drug, prepared this literature. He testified in the form of depositions. He said that the literature was formulated on the basis of information received by the

manufacturing laboratory from physicians doing research or otherwise using Levophed in their practice, and also from articles published in medical journals. This evidence was hearsay. It was an effort to use medical data based on statements made by a person out of court and not subject to cross-examination: VI Wigmore, Evidence, §1690 (3d ed. 1940).

The drug used in this case was not of common usage. It could not be obtained even by prescription. It could only be purchased by a duly licensed physician or hospital. The instructions for its use, contained in the literature, required interpretation that only specially trained people, such as qualified physicians, could give.

In addition, Dr. Lloyd and Dr. Goetz were cross-examined as to whether from their independent knowledge of the drug they concurred with the instructions in question. They agreed that the drug involved was potent and intended for emergency purposes only; that the patient receiving it should have maximum and constant attention; and, that tissue infiltration should be avoided. These, in substance, were the pertinent warnings contained in the literature and exhibits under discussion. The basis of the alleged negligence was that these warnings went unheeded. In view of these admissions on the stand by the appellee-doctors, we cannot see how, in any event, appellant's case was prejudiced by the rejection of these exhibits.

The judgment of the court below is affirmed.

Mr. Justice MUSMANNO dissents.