NOLAN *v.* DILLON ET AL.

[No. 376, September Term, 1970.]

*Decided April 14, 1971.*

The cause was argued before HAMMOND, C. J., and BARNES, MCWILLIAMS, FINAN, SINGLEY, SMITH and DIGGES, JJ.

*William A. Ehrmantraut,* with whom were *Donahue & Ehrmantraut* on the brief, for appellant.

*Joseph S. McCarthy,* with whom were *Thomas F. Hogan* and *McCarthy & Wharton* on the brief, for Linda A. Dillon, one of appellees. *Hugh L. Reilly,* with whom were

*Edward C. Bell* and *Bell & Reilly* on the brief, for American Home Products Corporation, other appellee.

SINGLEY, J., delivered the opinion of the Court.

In January 1968, Dr. David M. Nolan, a Montgomery County obstetrician, admitted Mrs. Linda Dillon, at that time 19 years of age, as his patient at Holy Cross Hospital in Silver Spring, where she was delivered of her first child. Mrs. Dillon was given two injections. The first, in preparation for delivery, was given at 12:45 a.m. and is only peripherally at issue. At 1:50 a.m., prior to delivery, when Mrs. Dillon became unmanageable and had to be restrained, Dr. Nolan gave Mrs. Dillon a second injection—an intravenous injection of Sparine, or promazine hydrochloride, a drug compounded and sold by Wyeth Laboratories Division of American Home Products Corporation (American Home) for use in allaying apprehension and anxiety.[1] Immediately following the injection, Mrs. Dillon's left hand became discolored and then cyanotic. Two anaesthesiologists attempted, without avail, to correct this by the use of stellate ganglion and brachial plexus blocks. Ultimately gangrene set in, and it became necessary to amputate the distal phalanges of Mrs. Dillon's index, ring and little fingers.

Mrs. Dillon and her husband sued Dr. Nolan in the Circuit Court for Montgomery County for negligence and American Home for negligence and breach of warranty, but dismissed the suit against American Home immediately prior to the commencement of trial. Mr. Dillon had withdrawn from the case when he and his wife separated. Dr. Nolan filed a cross-claim against American Home, sounding in negligence and breach of warranty.[2] The case came on for trial before Levine, J., and a jury. At the conclusion of Dr. Nolan's case American Home's

---

1. See *State ex rel. Shockey v. Washington Sanitarium & Hospital*, 223 Md. 554, 556, 165 A.2d 764 (1960).
2. American Home, while it was still a defendant, had cross-claimed against Dr. Nolan. When the suit against American Home was dismissed, Dr. Nolan's claim became a third-party claim.

motion for a directed verdict in its favor was granted. The jury returned a verdict of $72,500 against Dr. Nolan. Dr. Nolan's motion for a judgment n.o.v. or alternatively, for a new trial, was denied. From a judgment entered on the verdict and a judgment in favor of American Home for costs, Dr. Nolan has appealed.

There are really only two crucial issues in this case, both questions of law. The first is whether there was sufficient evidence of Dr. Nolan's negligence to go to the jury. The second is whether the warnings which American Home gave regarding the use of Sparine were adequate to warrant the granting of a directed verdict in its favor. We think, as did the trial court, that both questions should be answered in the affirmative.

There was testimony that Sparine was prepared by American Home and was available in the Holy Cross Hospital delivery suite in two concentrations: one a 10 cubic centimeter ampule containing 25 milligrams of the drug per cubic centimeter. The other, also a 10 cubic centimeter ampule, contained 50 milligrams of the drug per cubic centimeter, and was clearly labelled in large red letters, "For Intramuscular Use Only." Each package contained an insert which described the drug, its uses, and dosage and administration. The insert said, in part:

> "It is important to make sure that intramuscular injections are given deeply into large muscle masses, i.e., gluteal region, and intravenous injections are given in diluted solutions (25 mg./cc. or less) into the lumen of the vein. Under no circumstances should intra-arterial injections be given.
>
> "Sparine (Promazine Hydrochloride, Wyeth) when used intravenously should be used in a concentration no greater than 25 mg. per cc. The injection should be given slowly. Suitable dilution of the more concentrated solution, 50 mg. per cc., with an equivalent volume of physiological saline is advised if used intravenously. Under

such circumstances of use, the parenteral administration of Sparine (Promazine Hydrochloride, Wyeth) is well tolerated. Its use is not usually attended by local discomfort or irritation provided correct techniques are employed to insure injection into the lumen of the vein; care should be exercised during intravenous administration not to allow perivascular extravasation since under such circumstances chemical irritation may be severe. The intravenous administration of Sparine (Promazine Hydrochloride, Wyeth) in a concentration of 50 mg. per cc. has resulted in localized thrombophlebitis or vascular spasm and localized cellulitis in an extremely small number of cases. In nine cases, arteriolar spasm of the digital vessels with resulting gangrene has been reported, some of which have required amputation of the digits. Hazards such as this may be avoided provided that: 1) A concentration of no greater than 25 mg. per cc. be used; 2) The whole contents of the syringe be injected into the lumen of the vein; 3) That injections be made only into vessels previously undamaged by multiple injections or trauma." (Emphasis in original.)

In his pre-trial deposition, the transcript of which he had been given an opportunity to examine and correct, which was introduced in evidence at trial, Dr. Nolan said that he had injected Sparine "just as I got it from the ampule, (50 mgs)" [3] using a 2½ cubic centimeter syringe, clearly implying that he had used the 50 milligram concentration. The note on the hospital record, signed by Dr. Nolan, "Sparine 100 mgm I. [ntra] v. [enously] at 1:50 a.m." although not a contemporaneous one, would seem, if read in the light of the deposition, to bear this out.

At trial, Dr. Nolan testified that he had used the 25

---

3. Dr. Nolan had added "50 mgs" when he reviewed the transcript.

milligram per cubic centimeter concentration in a 5 cubic centimeter syringe to inject 100 milligrams of Sparine.

The testimony with regard to the site of the injections was somewhat conflicting. At trial, Dr. Nolan and the attending nurse testified that the first injection, a "cocktail" of Demorol, Scopolamine and Sparine, was given Mrs. Dillon at 12:45 a.m. in her right arm. In his pretrial deposition, Dr. Nolan had been much less certain about this. Dr. Nolan was sure that the second injection of Sparine was given at 1:50 a.m. in the antecubital vein of the left arm. Mrs. Dillon testified that she remembered only one injection, the first, and said it had been given in her left arm. This contradiction was one of consequence, for as will later appear, had both injections been given in the same arm, the chances of extravasation of the drug, or escape from the vein, would have increased.

In his deposition and in the clinical note which he dictated for the hospital record, Dr. Nolan attributed Mrs. Dillon's reaction to the possibility that the drug had extravasated or that some of the medication had been injected outside the vein. He explained this by saying that Mrs. Dillon was "thrashing about" in bed while he was giving the injection.

Dr. John Kuhn, called as an expert by Dr. Nolan, testified that the warnings given on the package insert provided reasonable directions as to dosage and concentration of Sparine and represented the standard of care followed by physicians practicing in Montgomery County. Dr. Kuhn said that the same instructions appeared in *Physicians' Desk Reference to Pharmaceutical Specialties and Biologicals* (PDR) published annually by Medical Economics, Inc., and distributed among physicians. Dr. Nolan admitted that PDR was available to him, that he was familiar with it, and when asked whether it was the "Bible", replied that it was "a good volume."

Dr. Donald Levitt, called as a witness by Mrs. Dillon, testified that an injection of Sparine in a 25 milligram concentration could cause a vascular spasm and cyanosis if injected into an artery, injected into the wall of an

artery or injected into a vein in such fashion that it extravasated.

From what we have said it seems clear that American Home's package insert and the label on the 50 milligram concentration fully discharged its duty to warn. The duty is to give a reasonable warning, not the best possible one, *Levin v. Walker Kidde & Co.*, 251 Md. 560, 563, 248 A. 2d 151 (1968) ; Annot., 76 A.L.R.2d 9 (1961) ; see, Noel, *Products Defective Because of Inadequate Directions or Warnings*, 23 Sw. L.J. 256 (1969) ; Dillard and Hart, *Product Liability: Directions For Use and the Duty to Warn*, 41 Va.L.Rev. 145 (1955) ; Prosser, *Torts* § 96 at 665 (3d ed. 1964). See also, 1 Frumer and Friedman, *Products Liability* § 8.01 at 143 (1968) ; 1 Hursh, *American Law of Products Liability* § 2.40 at 186 (1961). Even in jurisdictions which have espoused the doctrine of strict liability, Restatement, *Torts* 2d § 402 A at 347 (1965), and Maryland has not, *Myers v. Montgomery Ward & Co.*, 253 Md. 282, 252 A. 2d 855 (1969) ; *Telak v. Maszczenski*, 248 Md. 476, 237 A. 2d 434 (1968), American Home's warning would have protected it. See Comment K to § 402 A and *Davis v. Wyeth Laboratories, Inc.*, 399 F. 2d 121, 127 (9th Cir. 1968). For cases holding the warning which appeared in the Sparine package insert to be adequate, see *Magee v. Wyeth Laboratories, Inc.*, 214 Cal.App.2d 340, 29 Cal. Reptr. 322 (1963), where the court held that the warning protected the manufacturer of Sparine against a claim for death from agranulocytosis, grounded on breach of warranty, when it was possible to infer that the death resulted from the physician's failure to take precautions against infection as urgently recommended in the package insert and *Schrib v. Seidenberg*, 80 N. M. 573, 458 P. 2d 825 (1969) where a judgment entered against a physician who injected Sparine into an artery was affirmed, as was a judgment in favor of American Home on the ground that the warning was adequate. See also *Buchanan v. Downing*, 74 N. M. 423, 394 P. 2d 269 (1964) which dealt with an intramuscular injection of Sparine, holding neither the

physician nor American Home answerable in damages for a skin infection which developed. Compare, however, *Yarrow v. Sterling Drug, Inc.*, 263 F. Supp. 159 (D.S.D. 1967), *aff'd* 408 F. 2d 978 (8th Cir. 1969) (80% blind patient permitted to recover when manufacturer's warning in 1958 was simply that Aralen had produced "visual disturbances" and in 1963 that it caused "certain ocular complications" and so advised doctor).

On the testimony as a whole, whether Dr. Nolan was negligent, and whether his negligence caused Mrs. Dillon's injury were clearly jury questions.

Dr. Nolan assigns eight reasons why we should overturn the jury's verdict, arguing that each amounted to prejudicial error on the part of the lower court:

(i) The refusal to allow Dr. Nolan to proceed against American Home on the theory of strict liability and to establish that a person not a party to the suit was responsible for the injury.

(ii) The refusal to permit Dr. Nolan to proceed against American Home for indemnification.

(iii) The admission into evidence of photographs of Mrs. Dillon's hand "in combination with" testimony concerning her marital problems and financial difficulty.[4]

(iv) The denial of Dr. Nolan's motion to strike the testimony of Dr. Levitt given in response to a question which assumed that a 50 milligram concentration had been administered.

(v) The denial of Dr. Nolan's motions for a directed verdict at the close of Mrs. Dillon's case and at the close of all the evidence.

(vi) The refusal to admit into evidence Dr. Nolan's exhibits 2, 3, 4 and 5 (four articles from medical journals).

(vii) The refusal to permit Dr. Trenholm Fisher to testify.

(viii) The giving of three instructions to the jury.

---

4. The quoted phrase is Dr. Nolan's.

We propose to consider each of these arguments, expanding the recitation of such facts as may be germane to each issue.

(i)

*The court's refusal to allow Dr. Nolan to proceed against American Home on the theory of strict liability and to establish that a person not a party to the suit was responsible for the injury*

Maryland Rule 504 provides that a trial court may, at the request of a party or on its own motion, schedule a pre-trial conference to achieve, inter alia, a simplification of issues. Rule 504 c contemplates the entry of a pre-trial order:

"c. *Order of Court—Amendment.*

*The Court may make an order* which recites the action taken at the conference, the amendments allowed to the pleadings, and the agreements made by the parties as to any of the matters considered, and *which limits the issues for trial to those not disposed of by admissions or agreements of counsel.* Such order may thereafter be modified, either before or during the trial, as justice may require." (Emphasis supplied.)

On 6 April 1970, Judge Levine held a pre-trial conference in which counsel for all parties participated. On 15 April, Judge Levine circulated among counsel a draft of a pre-trial order consisting of 12 typewritten pages, which had been carefully drafted. It seems to be conceded that in his letter of transmittal, he asked that changes or corrections be submitted before 20 April, and suggested that the order be signed by counsel on 22 April. The order, signed by counsel, was entered on 24 April.

At the pre-trial conference, in outlining the case which he proposed to present, Dr. Nolan denied that he was guilty of negligence, and maintained that Sparine had been injected in accordance with the instructions given in the package insert prepared by American Home. In

support of his third-party claim against American Home, Dr. Nolan took the position that the warning given by American Home was inadequate, that American Home knew that intravenous administration of Sparine in accordance with its instructions could result in gangrene, and that Sparine should not be suggested for intravenous injection. All of this sounded in negligence.

At the trial of the case, counsel for Dr. Nolan attempted to make an end run around *Myers v. Montgomery Ward & Co., supra,* 253 Md. 282 and *Telak v. Maszczenski, supra,* 248 Md. 476, and to advance a claim against American Home on grounds of strict liability. He also endeavored to prove that the negligent act which proximately caused the injury was that of the nurse who prepared the injection for Dr. Nolan. Judge Levine ruled that Dr. Nolan was limited to the issues formulated in the pre-trial order.

Dr. Nolan says that this was error. While he concedes that our Rule 504 was modelled on Federal Rule 16, and that the two rules are virtually identical, he takes comfort from the fact that the first sentence of the Federal equivalent of our Rule 504 c contains an additional phrase:

"'* * *; and such order when entered controls the subsequent course of the action, unless modified at trial to prevent manifest injustice."

American Home counters with the suggestion that pre-trial is not intended to be an academic exercise; that the Maryland Rule, like the Federal Rule, is intended to achieve a simplification of the issues and, we might add, to minimize the element of surprise; that unless the parties are held to the issues as simplified, the purpose of the Rule is frustrated, and that the power of the court to modify the order necessarily implies that the order is intended to control the course of the trial.

In the posture of the case before us, we need not reach the basic issue. Judge Levine gave all counsel an opportunity to modify the pre-trial order, and took the precaution of having them endorse the order which was

filed. As we see it, from that moment, the order controlled the course of the trial, subject to the court's discretionary power to permit modification as justice may require. Under the circumstances here, we find no abuse of discretion.

Dr. Nolan argues that even if this is the case, the court permitted a modification when it allowed Mrs. Dillon to argue that she had been injected with a 50 milligram concentration rather than a 25 milligram concentration. This overlooks the fact that one of the specific acts of negligence asserted by Mrs. Dillon in the pre-trial order was the administration of "an improper dosage" of Sparine.

### (ii)

*The refusal to permit Dr. Nolan to proceed against American Home for indemnification*

We think that this question might have been more precisely phrased as "was it error for the court to have granted American Home's motion for a directed verdict at the close of Dr. Nolan's case?"

Here again, Dr. Nolan's contention is in part a reprise of the argument for the imposition of strict liability, to which reference has already been made. The pre-trial order clearly indicated that Dr. Nolan's case against American Home would be in negligence. As we have previously determined, on the facts American Home met the burden of its duty to warn, and under *Magee v. Wyeth Laboratories, Inc., supra,* 214 Cal.App.2d 340 and *Schrib v. Seidenberg, supra,* 80 N. M. 573, it would not have been held answerable either in an action sounding in breach of warranty or in negligence.

### (iii)

*The admission into evidence of photographs of Mrs. Dillon's hand "in combination with" testimony concerning her marital problems and financial difficulty*

Exceptions taken to the admission of three color photo-

graphs of Mrs. Dillon's hand prior to the amputation of the fingers were overruled, and we think properly. There was no contention that these did not fairly and accurately depict the condition of the hand at that time, and photographs which meet this test are not impermissibly inflammatory. Such matters must be left largely to the trial court's discretion. *Garozynski v. Daniel*, 190 Md. 1, 5, 57 A. 2d 339 (1948) ; *Kirsch v. Ford*, 170 Md. 90, 94, 183 A. 240 (1936). We have examined the photographs and find no abuse of discretion here.

Mrs. Dillon was permitted to testify, over Dr. Nolan's objection, that she had been separated from her husband since October, 1968 and that he was not contributing to the support of their child. She testified without objection that her abilities as a typist had been adversely affected by her injury. It was made clear to the jury that it was not Mrs. Dillon's contention that the domestic situation was a result of the injury. The testimony was properly admitted as proof of the fact that Mrs. Dillon's earning capacity had been permanently impaired by the injury. See *Ihrie v. Anthony*, 205 Md. 296, 305-07, 107 A. 2d 104 (1954).

We do not understand whether the thrust of Dr. Nolan's argument on appeal is that the photographs and the testimony were improperly admitted, or improperly admitted "in combination with" each other. If the latter is the case, since the objection was not made at trial, it cannot be raised here. Rules 522 d 2 and 885.

### (iv)

*The denial of Dr. Nolan's motion to strike the testimony of Dr. Levitt, given in response to a question which assumed that a 50 milligram concentration had been administered*

Dr. Donald Levitt, called as an expert by Mrs. Dillon, testified on direct examination without objection:

"Q. Now, do you have an opinion based on reasonable medical certainty as to the cause of

this immediate reaction cyanosis and ultimate gangrene? A. Yes.

"Q. Could you tell us what your opinion is as to its cause? A. The artery was thrown into an intractable very severe spasm and prevent[ed] blood supply to the lower extremity. The cause of the spasm most probably was one of three things; the material was injected into the artery, the material was injected into the wall of the artery, or the material extravasated or spilled out from the vein and surrounded the artery throwing it into severe spasm.

"Q. Are we to understand that any one of those things, an injection into the artery, or an injection around the wall of the artery, or an injection into the vein in which it got out of the vein would have set the artery in motion or attacked the wall of the artery? A. That is correct.

"Q. Pathologically, what happens when either one of those three things occur? A. Well, because of the irritating nature of the medication, the artery goes into spasm. It constricts and permits no blood supply.

"Q. What is the effect of lack of blood? A. You get a disorder which we call chemia. It is a loss of warmth, a change in color, the normal pink to a bluish discoloration and the bluish discoloration occurs in patches. It usually proceeds from the point of most severe loss and proceeds onward to the point of blockage.

"Q. Is the time element that Doctor Nolan testified to the time development of significance to you in reaching your opinion? A. Yes. I think the time element would probably indicate that it got into the artery or damaged the wall somehow."

Later, again without objection, Dr. Levitt repeated this testimony.

"Q. What, in your best medical opinion, predicated on reasonable medical probability was the cause of the situation that developed in her left hand? A. I believe you asked that same question. I will give you the answer.

"In my opinion, the extravasation of the—one of three reasons why the artery would go into spasm. Extravasation, injection into the wall of the artery, or direct injection into the artery itself. The latter two most likely, in my opinion, just because of the speed in which it occurred.

"Q. That would be extravasation? A. No. Injection into the artery or injection into or just around the wall of the artery."

Finally, Dr. Levitt was asked a hypothetical question, which he was permitted to answer, over objection.

"Q. All right. Let me back up, Doctor.

"Assume the second injection was made in your left arm was made of 100 milligrams of undiluted Sparine; assume further that it was taken from a 50 milligram ampule and given in a 2½ cc syringe and assume that immediately, within from a few seconds to a minute or two after the injection was made, we have the onset of mottling noticed first by the physician who made the injection in the hand; that this spread rapidly up to the left forearm and close to the elbow. Assume further, Doctor, that within a short period thereafter cyanosis, bluishness developed in the hand, in the fingers. Assume further that stellate blocks were given within several hours after the second injection. Assume that by 6:30, the following morning, there was evidence there were blue fingernails, blue tips to the fingers; assume that there was further care in the form of stellate blocks given by the anesthesiologist at Holy Cross and assume further that within a short time thereafter, certainly

by February, early February, a positive diagnosis of gangrene in the index finger, ring and little fingers of the left hand was made and following that diagnosis, those three digits that I have enumerated to you were amputated.

"Now, I want to ask you whether or not in your opinion the care and treatment given to Mrs. Dillon in giving this 100 milligrams injection of Sparine on January 9th was in conformity with the usual standard of skill and care ordinarily exercised by physicians practicing here in Montgomery County?

"MR. EHRMANTRAUT: Objection, Your Honor.

"THE COURT: What are your grounds?

"MR. EHRMANTRAUT: The grounds are as previously stated at the bench and the Court will refer back to the lack of evidence of the 50 milligrams concentration.

"THE COURT: Well, I will overrule it on that basis and require the witness to consider the question as asked and add to that that your answer must be based upon reasonable medical certainty.

"THE WITNESS: That is a long question. Would you repeat the last sentence?

"(Whereupon, the question was read to the witness.)

"THE COURT: One further modification; by a physician specializing in obstetrics and gynecology.

"THE WITNESS: No.

"BY MR. McCARTHY:

"Q. It was not? A. No, it was not."

It was this testimony which was the subject of the motion to strike.

In dealing with the propriety of hypothetical questions, this Court said in *Gordon v. Opalecky*, 152 Md. 536, 137 A. 299 (1927):

"\* \* \* Such questions are usually and properly asked in one of two ways. One is where the evidence is uncontradicted and the witness has heard or read it. In such a case he is asked to express an opinion predicated upon the assumption that the evidence thus known to him is true. The other way is to state to the witness such facts as are essential to the formation of a fair and intelligent opinion, ask him to assume the truth of the facts so stated, and to express an opinion upon them." At 548-49.

See also *Baltimore County v. State ex rel. Keenan*, 232 Md. 350, 193 A. 2d 30 (1963) ; *State ex. rel. Solomon v. Fishel*, 228 Md. 189, 179 A. 2d 349 (1962) ; *State ex rel. Kalives v. Baltimore Eye, Ear & Throat Hospital, Inc.*, 177 Md. 517, 10 A. 2d 612 (1940) ; *Miller v. Leib*, 109 Md. 414, 72 A. 466 (1909). It is the latter type of hypothetical question that was put to Dr. Levitt.

The admissibility of a hypothetical question lies largely in the discretion of the trial court, *Williams v. Dawidowicz*, 209 Md. 77, 120 A. 2d 399 (1956). In *Twombley v. Fuller Brush Co.*, 221 Md. 476, 158 A. 2d 110 (1960), we distinguished *Thompson v. Standard Wholesale Phosphate & Acid Works, Inc.*, 178 Md. 305, 13 A. 2d 328 (1940) on which Dr. Nolan places his principal reliance, and said:

"In these circumstances we do not think that it is shown that there was such a conflict as to facts as to make Dr. von Oettingen's testimony inadmissible under the rule stated in *Thompson v. Standard Wholesale Phosphate & Acid Works, Inc., supra,* [178 Md. 305] that an expert's opinion based upon assumed facts cannot be based upon conflicting testimony as to the facts. We do not believe that this rule goes so far as to say that an expert may not express an opinion where some fact or facts may point to one conclusion and another or others point to an oppo-

site conclusion. If such were the rule, the use of expert testimony based upon the evaluation of a number of facts would be severely, and we think too much, restricted. The facts upon which Dr. von Oettingen based his opinion were, we think, such as to 'permit reasonably accurate conclusions, as distinguished from mere guess or conjecture,' (*Marshall v. Sellers*, 188 Md. 508, 519, 53 A. 2d 5 [1947], in which this test was stated but was held not to have been met), notwithstanding that this particular item of discoloration and possibly one or two others may have militated against his conclusion. That would seem to be a question for the jury to consider in weighing his overall opinion. *Marshall v. Sellers, supra,* 188 Md. at 518." 221 Md. at 487.

The problem in the present case was similar. There was a conflict in testimony, but there was evidentiary support for certain facts, the truth of which Dr. Levitt was asked to assume in his answer to the hypothetical question. These facts were before the jury, which was entitled to have the benefit of Dr. Levitt's expert opinion, predicated on all the facts which supported the hypothesis.

We find no error in the lower court's denial of the motion to strike.

(v)

*The denial of Dr. Nolan's motions for a directed verdict at the close of Mrs. Dillon's case and at the close of all the evidence*

In two recent cases, *Anderson v. Johns Hopkins Hospital*, 260 Md. 348, 350, 272 A. 2d 372 (1971) and *Johns Hopkins Hospital v. Genda*, 255 Md. 616, 621, 258 A. 2d 595 (1969), we have had occasion to reaffirm the rule of the Maryland cases applicable to medical malpractice. It is perhaps nowhere better stated than it was by Chief Judge Brune, speaking for the Court in *Lane v. Calvert*, 215 Md. 457 at 462-63, 138 A. 2d 902 (1958):

"The rules of law applicable in this State to cases of alleged medical malpractice, such as the present, are well established. There is a presumption that the doctor has performed his medical duties with the requisite care and skill. *State, Use of Janney v. Housekeeper,* 70 Md. 162, 16 A. 382 [1889]; *Fink v. Steele,* 166 Md. 354, 171 A. 49 [1934]; *McClees v. Cohen,* 158 Md. 60, 148 A. 124 [1930]. The burden of proof is on the plaintiff to show both a lack of the requisite skill or care on the part of the doctor and that such want of skill or care was a direct cause of the injury; and if proof of either of these elements is wanting the case is not a proper one for submission to the jury. *State, Use of Kalives v. Baltimore Eye, Ear and Throat Hospital,* 177 Md. 517, 10 A. 2d 612 [1940]; *Angulo v. Hallar,* 137 Md. 227, 233, 112 A. 179 [1920]. The rule as to the degree of skill required is stated in *Dashiell v. Griffith,* 84 Md. 363, 380, 35 A. 1094 [1896]: '* * * the amount of care, skill and diligence required is not the highest or greatest, but only such as is ordinarily exercised by others in the profession generally.' This rule has since been followed consistently in *Miller v. Leib,* 109 Md. 414, 426, 72 A. 466 [1909], and *Angulo v. Hallar, supra.*

"It is well established by the case law in this State that the mere fact that an unsuccessful result follows medical treatment is not of itself evidence of negligence. *Bettigole v. Diener,* 210 Md. 537, 124 A. 2d 265 [1956]; *State, Use of Kalives v. Baltimore Eye, Ear and Throat Hospital, supra.* Nor does the doctrine of *res ipsa loquitur* apply. *Bettigole v. Diener, supra.*" 215 Md. at 462-63.

In the case before us, Dr. Kuhn, called as a witness by Dr. Nolan, testified that the warning in the package insert as to dosage and concentration of Sparine was readily

available to physicians and that the use of the recommended dosage represented the standard of care followed by physicians practicing in Montgomery County. Dr. Levitt, called by Mrs. Dillon, testified that the injection of a 25 milligram concentration could cause cyanosis if injected into an artery, into the wall of an artery, or into a vein in such fashion that it extravasated. In response to the hypothetical question, Dr. Levitt testified that an intravenous injection of 100 milligrams of Sparine in a 50 milligram concentration was not in conformity with the usual standard of skill and care ordinarily exercised by a physician specializing in obstetrics and gynecology, practicing in Montgomery County.

It is this testimony, of course, which is the element which distinguishes this case from *Anderson, Genda* and *Lane,* all *supra.* Mrs. Dillon met the burden of adducing sufficient evidence to rebut the presumption that medical duties were performed with requisite skill and care, and that the testimony of the want of skill or care, if believed by the jury, could have been the cause of her injury. As we said in *State ex rel. Kalives v. Baltimore Eye, Ear & Throat Hospital, Inc., supra,* 177 Md. 517, 526-27:

> "Before the equitable plaintiffs can recover against any of the defendants, it must be shown by affirmative evidence that they were either unskilled or negligent in their respective capacities, and that such want of skill or care resulted in the death of Mr. Kalives. If either of the above elements is lacking in the proof, then no case for the consideration of the jury has been presented."

Had the testimony been confined to the fact that an extravasation had occurred while Dr. Nolan was attempting to inject a 25 milligram concentration into the previously uninjected arm of an unmanageable patient, the result might well have been controlled by *Riley v. United States,* 248 F. Supp. 95 (D. Md. 1965), where there was extravasation of calcium injections, but no

evidence of negligence, or by *Johns Hopkins Hospital v. Genda, supra,* 255 Md. 616. Because there were other facts which the jury could consider, we conclude that Dr. Nolan's motions for a directed verdict were properly denied.

### (vi)

*The refusal to admit into evidence Dr. Nolan's exhibits 2, 3, 4 and 5 (four articles from medical journals)*

A series of articles from professional journals had been marked for identification as Dr. Nolan's exhibits 2, 3, 4 and 5:

(2) T. L. Fisher, M.D., "Gangrene of Hand Following Intravenous Injection of Promazine", Vol. 94 at 1357, Canadian Medical Association Journal, June 25, 1966

(3) Morton Opinsky, M.D., A. Frederick Serbin, M.D. and Joseph E. Rosenfeld, M.D., "Arterial Thrombosis with Gangrene After Use of Promazine (Sparine) Hydrochloride", Vol. 168, No. 9 at 1224, The Journal of The American Medical Association, November 1958

(4) T. L. Fisher, M.D., "Intravenous Promazine: A Cautionary Note", Vol. 95 at 367, Canadian Medical Association Journal, August 20, 1966

(5) James H. Shell, Jr., M.D., Davis B. McIntyre, Jr., M.D. and James Castellano, M.D., "Gangrene After Use of Gamma-Dimethylamino-N-PROPYL-Phenothiazine Hydrochloride (Promazine)", Vol. 78 at 1219-20, American Journal of Obstetrics and Gynecology, December 1959.

All of the articles dealt with recorded cases of vascular difficulties experienced after the use of Sparine or promazine. They were proffered to show that intravenous injections of Sparine, even if used in the 25 milligram concentration recommended by the manufacturer in the package insert, could produce serious contraindications.

We agree that the journal articles were properly excluded. It is well settled that medical books and treatises are not admissible as such, nor may they be used in the direct examination of experts, although their use is sanctioned in cross-examination. *Allison v. State,* 203 Md. 1, 6, 98 A. 2d 273 (1953) ; *Louis Eckels & Sons Ice Mfg. Co. v. Cornell Economizer Co.,* 119 Md. 107, 114, 86 A. 38 (1912) ; *Grantham v. Goetz,* 401 Pa. 349, 164 A. 2d 225 (1960), involving an almost identical problem; 6 Wigmore, *Evidence* §§ 1690-2 at 2-6 (3d ed. 1940) which recognizes the rule, but gives the arguments against it; 29 Am.Jur.2d *Evidence* § 890 at 996 (1967) ; Annot., 84 A.L.R.2d 1338 (1962) ; Annot., 65 A.L.R. 1102 (1930). Additionally, as the trial court observed, only one of the articles identified Sparine as the drug used and none disclosed the quantity as opposed to the concentration of the drug.

(vii)

*The refusal to permit Dr. Trenholm Fisher to testify*

Dr. Nolan produced as a witness Dr. Trenholm Fisher, a specialist in internal medicine, with a subspecialty in hematology, who was the Secretary-Treasurer of the Canadian Medical Protective Association and the author of two of the articles mentioned in (vi) which had appeared in the Canadian Medical Association Journal. When an objection made to Dr. Fisher's testimony was sustained, counsel for Dr. Nolan proffered in a colloquy with the court what his testimony would be:

"MR. EHRMANTRAUT: Then, Your Honor, the proffer of the testimony of the witness Doctor Fisher would be that the witness has as a result of his investigation documented eight instances in which there have been side effects resulting in development of gangrene or similar complications following the use of the drug Sparine, seven of the eight of these injections were definitely intravenous and we would fur-

ther show that [in] one of those seven, there was admittedly extravasation. The other six were not. We would further proffer that seven of the eight cases followed the instructions of the manufacturer as to the use of the Sparine."

\* \* \*

"May I say this, Your Honor, in a further proffer to the Court? As I understand it, in No. 2 you said even if the foundation is met [you] find defects in the context because none of the purported episodes show the concentration of the Sparine given. Our further proffer would be that we would be able to establish the actual concentration of the Sparine administered intravenously."

\* \* \*

"I have proffered the testimony of Doctor Fisher who can testify that their investigation reflects that a dose of Promazine in one case [where] 15 milligrams [were] given intravenously caused these problems."

We do not agree with the contention that it was error to exclude Dr. Fisher's testimony. Had he been the treating physician, his testimony would have been admissible, *Marshall v. Sellers,* 188 Md. 508, 517, 53 A. 2d 5 (1947). Had he been offered as an expert, who had heard the evidence, the ruling might well have been different, *Twombley v. Fuller Brush Co., supra,* 221 Md. 476, 485-87. Had he been qualified as an expert, he might have been permitted to answer a hypothetical question, *Johnston v. Schmidt,* 158 Md. 555, 565, 149 A. 283 (1930). But he was none of these. He had simply collected clinical data from others, and had incorporated them in articles which he had written in an effort to protect the profession. His testimony, like his articles, was inadmissible hearsay. *Grantham v. Goetz, supra,* 164 A. 2d 225 reached the same result on similar facts.

(viii)

*The giving of three instructions to the jury*

Dr. Nolan assigns error to three of the instructions given the jury. In the course of fully charging the jury on the burden of proof and the duty to use due care, the court said:

[1.] "In determining whether the Defendant has violated the accepted standards of practice in his field in this community at the time of the incident complained of, you may consider the directions and warnings contained in the manufacturer's labeling which have been admitted in evidence together with all of the other evidence bearing on this question. In other words, this labeling is evidence to be considered with all other evidence in determining whether the Defendant adhered to the standards of practice accepted by other practitioners in the same field in this community at the time of the occurrence complained of herein."

\* \* \*

[2.] "She contends that this spasm was caused by one or more of the following reasons: One, that the Defendant injected Sparine into an artery; and/or two, that he injected the Sparine into the wall of an artery; and/or three, that there was an extravasation, that is an escape of the Sparine from a vein; and/or four, that the injection was made into a previously traumatized vein; that is, in the same area of the same arm and/or five, that Doctor Nolan injected an improper concentration by using 50 milligrams per cc rather than 25 milligrams per cc as recommended by the manufacturer."

\* \* \*

[3.] "You may also compensate the Plaintiff for the loss of income which you find she has reasonably lost or the lessening of earning capacity

> she is reasonably likely to sustain in the future
> as the natural and proximate result of her in-
> juries."

The first and third instructions were, in our view, quite proper. As we have pointed out, there was ample testimony that a failure to observe the manufacturer's warnings did not conform to the standards of practice in the field of obstetrics in Montgomery County. The package insert, which came in without objection, does not standing alone establish a standard of care, but rather, prima facie proof of proper use, *Julien v. Barker,* 75 Idaho 413, 422, 272 P. 2d 718 (1954) ; *accord, Salgo v. Leland Stanford Jr. University Board of Trustees,* 154 Cal.App.2d 560, 576, 317 P. 2d 170 (1957) ; see *Sanzari v. Rosenfeld,* 34 N. J. 128, 167 A. 2d 625 (1961). Whether there was a failure to use properly, and whether such a failure proximately caused the injury, were jury questions.

The third instruction permitted the jury, in assessing damages, to take into account past loss of earnings and a lessening of earning capacity in the future. Mrs. Dillon testified that she was delayed in returning to work, and that she had been trained as a typist. There was medical testimony that she had a 25% permanent disability of her left hand, which would interfere with her typing. These were facts which were properly matters for jury consideration, *Hutzell v. Boyer,* 252 Md. 227, 238, 249 A. 2d 449 (1969) ; *Delph v. Ammons,* 239 Md. 662, 668, 212 A. 2d 504 (1965) ; *Adams v. Benson,* 208 Md. 261, 271, 117 A. 2d 881 (1955) ; *Ihrie v. Anthony, supra,* 205 Md. at 305-07.

Dr. Nolan objects to what he conceives to be the second instruction, as if it were an instruction that "the appellant was negligent if he injected Sparine intravenously and it extravasated and caused the injury." In a colloquy at the time the exception was made, the court made it clear that the part of its statement to which Dr. Nolan excepted, which appears above as a direct quotation from

the transcript, was not an instruction, but rather a summary of Mrs. Dillon's claim. It appears to us that the court was right, and that the exception should have been denied.

For the reasons stated, we find no merit in any of the errors assigned, and shall affirm the judgments.

*Judgments affirmed; costs to be paid by appellant.*